Edward KLUG, Plaintiff and Appellee,

v.

KELLER INDUSTRIES, INC.,
Defendant and Appellant,

and

Bomgaars Supply Company, a
corporation, Defendant.

No. 13797.

Supreme Court of South Dakota.

Argued Nov. 15, 1982.

Decided Dec. 28, 1982.

Steven M. Johnson of Brady, Kabeiseman, Reade, Abbott & Johnson, Yankton, for plaintiff and appellee; John Harmelink of Harmelink Law Office, Yankton, on brief.

James E. Doyle of Doyle, Bierle, Porter & Kennedy, Yankton, for defendant and appellant; Patrick Norris of Purcell & Wardrope, Chicago, Ill., on brief.

DUNN, Justice.

This is an appeal from a judgment awarding Edward Klug (appellee) damages for personal injuries resulting from the use of a defective ladder manufactured by Keller Industries, Inc. (appellant). We affirm.

In the spring of 1979, appellee agreed to tear down a house in St. Helena, Nebraska, in exchange for the lumber in the structure. Appellee intended to construct a double garage with the lumber he salvaged. On June 6, 1979, appellee purchased a Keller Model 706 ladder at Bomgaars Supply in Yankton, South Dakota, for $28.49, plus tax. Labels on the ladder stated it was "[m]anufactured to meet OSHA standards for metal ladders, duty rating 225 pounds." Appellee weighed approximately 210 pounds at the time.

On June 15, 1979, appellee was using the ladder so he could remove some shingles from the entryway of the house he was razing. Appellee set the ladder on a cement slab near the entry to the house, climbed to the fourth step,* and, using a little bar, started removing the bottom row of shingles. Appellee testified that he was removing the bottom row of shingles and flipping them into a nearby pickup truck when the ladder suddenly fell back and to the right and he found himself lying on the sidewalk. When appellee looked at the ladder, he saw it was bent and twisted out of shape. Testimony established that a rivet was missing from a hole at the time of the accident.

Appellee's right arm was in considerable pain as a result of the fall. Appellee was taken to a hospital where he was examined. Appellee left the hospital the same day with his arm in a sling. At a later date, appellee was examined by several other physicians, including an orthopedic specialist who gave him a shot in the shoulder. Appellee took, and still takes, medication to relieve the pain which resulted from the fall.

Testimony from the treating physicians indicates that appellee suffers from two injuries. The first is a rotator cuff tear which is an injury to the shoulder and arm caused by a tearing of the ligaments and tendons in that area of the body. While it may be treated by cortisone shots to the affected area and anti-inflammatory drugs, it is a permanent injury and cannot be repaired by surgery. The second injury is termed myositis ossificans. This condition occurs when there has been an acute injury to a portion of the body, in this case appellee's right shoulder and arm, and the impact is such that significant bleeding occurs in the area of the tear. This bleeding lead to calcification instead of the production of fibrous tissue, and, as a result, bone tissue built up within the muscle tissue. This in turn resulted in pain, limitation of motion and the loss of muscle strength. This injury is not correctable by surgery and will remain indefinitely. One doctor testified the net result was a 19% permanent impairment of the right arm and at least 11% impairment of the whole body. Another doctor stated the injury resulted in a 19% injury overall.

Despite these injuries, appellee continued working at Cimpl Meat Packing (Cimpl) in Yankton, South Dakota, without taking sick

* At trial, appellee disavowed his earlier deposition statement which said he was "on the third one from the bottom."

leave. Due to his restricted mobility, however, Cimpl hired a part-time employee to assist appellee in his duties as a night utility worker. Testimony by appellee's supervisor indicated that Cimpl would probably reverse the situation in the near future and make appellee the part-time employee and his assistant the full-time employee. Appellee was even told that if he could not perform up to the level he did before the injury he might be replaced altogether. Moreover, appellee's supervisor testified that appellee already had the easiest job in the plant and there were no other jobs that would be easier on his injured arm.

Aside from these work-related problems, appellee has also experienced severe changes in his personal life. Appellee can no longer manage his little league team because he cannot hit or throw the balls. He experiences too much pain to pursue his hobbies of bowling, fishing and gardening. Although he used to perform mechanical and handyman services around the home, he now finds it impossible to even pound nails or put in weather stripping. Appellee's wife testified that he can no longer sleep on his right side and is forced to spend most of the night on the davenport. Appellee's wife characterized the cupboard and refrigerator as looking like pill cabinets and also noted the family environment has deteriorated since the accident because appellee is irritable all the time.

At trial, appellee used an economist to forecast future lost wages under two alternatives. First, the economist determined the net present value of the economic loss appellee would suffer if his employment were reduced from full to part-time. This was determined to be $77,259.00. Second, the economist determined what the net present value of the economic loss would be if appellee, as he had previously been threatened, were to be replaced and were forced to find another job at minimum wage. Under this scenario, the loss was calculated to be $106,568.00.

The matter was tried before a jury in March of 1982. The jury returned a verdict in favor of appellee and against appellant for the sum of $200,000.00. The jury found the place of purchase, Bomgaars, free of any liability. Appellant's motions for a new trial, remittitur and judgment notwithstanding the verdict were all denied by the trial court. Appellant now appeals to this court on the issues discussed below.

Appellant's primary basis for appeal is that the trial court erred in not granting a new trial because there was insufficient evidence to justify the $200,000.00 verdict. Appellant is apparently arguing that a new trial is warranted for two reasons. Appellant contends, although he cites no authority, that a new trial is required because of the "[i]nsufficiency of the evidence to justify the verdict" under SDCL 15–6–59(a)(6) and because "[e]xcessive ... damages ... have been given under the influence of passion or prejudice" under SDCL 15–6–59(a)(5). We address each in turn.

We recently stated that a new trial is not justified on the basis of insufficiency of the evidence to support the verdict unless it appears that the evidence was conflicting on several controlling points and that the findings of fact were unreasonable, arbitrary, and unsupported in light of the other evidentiary facts proven. *Lewis v. Storms,* 290 N.W.2d 494 (S.D.1980). We do not find that situation to be present in the case at hand.

■ Although a generous award, our review of this case convinces us that the evidence supported the verdict. As this court stated in *Byre v. Wieczorek,* 85 S.D. 645, 190 N.W.2d 57 (1971): "When the sufficiency of the evidence to support a verdict is challenged the court must view the evidence in the light most favorable to the successful party and he should have the benefit of every reasonable inference that can be drawn therefrom." *Id.* 190 N.W.2d at 59. We find the following synopsis by the trial judge to be dispositive in affirming the damage award in this case:

> The first matter that I want to address is the defendants' claim that the evidence as to damages does not support the verdict .... Now, counsel have not re-

viewed the evidence as to the damages that are claimed, or the injuries that are claimed resulting in the damages, in this particular case. But I have made some notes from my own trial notes and find that we had a fifty year old plaintiff with an eighth grade education. He has no special skills. He has an average life expectancy of 24.8 years. He, I think, was working for Cimpl's Meat Market, or however it is called, at Yankton for some four years at the time of the trial. He was taking care of the cookers and putting meat in the cookers and pulling pins and unshrouding beef carcasses. And after the injury, of course, the evidence is clear that pulling the pins and unshrouding the beef was no longer possible for this plaintiff and that additional help had to be employed by Cimpl. Before the accident, the evidence is undisputed, that this plaintiff was righthanded, that he looked forward to managing a Little League team, he was an avid fisherman, he liked to bowl, that he had always a reasonable size garden, that he did many of the carpenter—or small carpenter work around the house building shelves and so on. And he was also very handy to a limited extent with the repair of vehicles, and that he was dismantling the residence in St. Helena, Nebraska for the purposes of building a double garage to his house.

Now, the wife testified that as long as she has known this plaintiff his work always involved physical labor. This is the only way that this man can earn a livelihood. And she corroborated the fact that plaintiff did the gardening and the fixing and so forth. She also testified that to the present day he finds it very difficult to rest or sleep at night, that he cannot lay on his right side for any period of time, if at all, because of the pain which subsists in his right arm, and that he ends up generally spending most of the night on the davenport. He is still taking pain pills. And that because of his injury, whereas before the injury, the family was a fairly closeknit family, it now has not been nearly that close. The plaintiff has a quick temper, he becomes irritated with members of his family, and then generally just sits around now when he is home reading, whereas before he participated in family activities quite frequently. Now there is little, if any, of that going on.

Now, that is a general picture of this man's problem as a result of the injury that he sustained. Dr. Mark Rhoades testified that the plaintiff sustained a muscle tear, that is to his rotator cuff in his right arm, or right shoulder, however you wish to locate that injury. That there is a calcification taking place in the muscle area which is permanent in nature. And that in his opinion the permanent impairment or function of the right arm was at least 19 percent, and at least 11 percent of the whole body, and that surgery is not going to change that. Dr. Lesher, his deposition I think was read into the record, stated that the plaintiff will suffer from a permanent lack of motion and a permanent disability as to the use of his right arm. And that in his opinion the plaintiff suffered a 19 percent impairment overall.

Now, there has been, of course, an instruction given to the jury, among which informs the jury that a verdict may be returned in such sums as they deem reasonable and supported by the evidence for pain and suffering and mental anguish experienced and reasonably certain to be experienced in the future. And also a very important item of damages, at least in the mind of this court, is the plaintiff's loss of enjoyment of his lifestyle. Here we have a man who needs his hands, needs his arms, to really get along in this world and do the things when he is not working such as bowling and fishing and fixing around the house and tinkering with automobiles. And the testimony is that there is simply not going to be that opportunity for him because of the injury. There has been pointed out, of course, no broken bones, and the medical expenses were very small in amount. But, of course, I don't believe

that that is any criteria or any evidence as to what this man's injury was and what pain and suffering and discomfort and loss of enjoyment of life really is.

We turn now to appellant's assertion that a new trial is justified because the damages awarded were the result of passion and prejudice. In *Brewer v. Mattern,* 85 S.D. 356, 182 N.W.2d 327 (1970), this court adopted a test to be applied in these situations. We said:

The damages, therefore, must be so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line; for they have no standard by which to ascertain the excess.

*Id.* 182 N.W.2d at 332–33 (quoting from *Schuler v. City of Mobridge,* 44 S.D. 488, 184 N.W. 281 (1921)).

Appellant argues prejudice arose because of publicity from a previous case in which certain members of the jury had served. In the prior case, a defense verdict was rendered and the victim's mother thereupon wrote several letters to local newspapers decrying the result.

We find absolutely no support for appellant's position in the record; in fact, we find just the opposite. The trial judge, when speaking to the prejudice argument, noted:

This court is of the opinion that that is not supported by the record. That there was an examination of all prospective jurors by defendants' counsel, and the question of the other trials, at least some of them, came up and whether or not it would affect their judgment in this particular case. And the recollection of this court is that all of the jurors, at least that were seated, indicated that that was not going to influence them, that they understood this was a separate and distinct trial and any decision they made would have to be based on the evidence and

instructions at this trial. Furthermore, I believe, as mentioned by Mr. Johnson, at no time had there been a request by counsel for a special venire to try this particular case. And defendant now is asking this Court to speculate as to the sympathy that might have permeated this jury and brought about the verdict.

We are convinced the prior letters to the editor did not influence the jury in reaching its decision in the case at hand.

■ Closely related to appellant's sufficiency of the evidence arguments is appellant's assertion that the trial court erred in allowing the economist to testify as to economic loss in the event appellee were to lose his job. There is no question that ample evidence existed to justify the economist's projections regarding part-time versus full-time employment. Although a much closer question, we believe there is adequate evidence in the record which justified the trial court's decision to allow the economist to make forecasts as to lost wages due to termination.

Two specific references in the transcript raise the issue of termination. The first was a reference in appellee's employment record which stated: "I told him he should try to do more and we will observe it . . . . We are killing more cattle and if he can't do it, *we might have to replace him.*" (Emphasis supplied.) Additionally, appellee's wife testified that her husband had been threatened with a reduction to part-time status or they might find someone else who could do the job. We believe these references raise the issue of termination and justify the economist's projections on this matter. While the issue was raised, it was for the jury to decide which prospect was more likely: the reduction from full-time to part-time employment or actual termination.

■ Appellant next contends the introduction of a ladder manufactured by appellant with design changes made in the lower rear portion of the ladder was reversible error. This court has previously ruled on the admissibility of evidence demonstrating

the use of subsequent remedial measures in strict liability actions. In *Shaffer v. Honeywell, Inc.,* 249 N.W.2d 251 (S.D.1976), this court, in discussing the use of subsequent remedial measures, drew a distinction between negligence actions and strict liability actions. While we would not allow their use in negligence actions, we did conclude post-accident safety measures were admissible as evidence in strict liability cases like the one at hand. Although we note a split of authority in other jurisdictions on this precise issue, we find no compelling reason to alter our position at this time. Moreover, we note that appellant's expert witness testified that he had tested another Keller ladder for alleged defects and could not find any. Appellee introduced the new model ladder as a form of impeachment to show that a new model of Keller ladders was being sold at the time the expert purchased his for testing. Accordingly, we conclude use of the ladder with subsequent design modifications was not error.

 We reach a similar conclusion as it relates to appellant's assertion that it was error not to instruct on comparative fault. In *Smith v. Smith,* 278 N.W.2d 155 (S.D. 1979), this court concluded that contributory negligence and comparative negligence were not defenses in strict liability cases. In his special concurrence, Justice Henderson noted that:

> [W]ere we to adopt comparative negligence as a defense to strict liability cases . . . we would be placing a burden upon a jury that was highly arithmetic, if not algebraic, and justice for the parties would be lost in a world of technical wonderment. Furthermore, comparative negligence, if applied as a defense, literally eats away, consumes, and destroys the basic purpose of strict liability.

*Id.* at 163. Our view on this question has not changed and we decline appellant's invitation to alter our holding at this time.

 Appellant also contends the trial court erred in allowing the introduction of a transcript from a former trial in which appellant's expert witness was involved. Appellant's reliance on some unspecified portion of SDCL 19–17 which relates to authentication and identification is misplaced because the transcripts were not offered into evidence and were used for impeachment purposes only.

The expert witness had a memory lapse when asked how many times he had testified on behalf of appellant at other trials. The witness, after reviewing the transcript from a prior trial outside the presence of the jury, was able to recall testifying in a prior case and making a deposition in another case. The transcript was not offered into evidence and, in a sense, appellant's own witness authenticated the transcript. By use of these materials, appellee was able to establish that the witness had been employed by appellant on numerous occasions in the past. We find the use of the transcript was within the realm of proper impeachment and it was not an error to allow its use for that limited purpose. *See State v. Wilmore,* 192 Neb. 807, 224 N.W.2d 756 (1975).

We have considered the remaining issues raised by appellant and conclude that they are without merit.

The judgment is affirmed.

All the Justices concur.