Darrell K. WANGEN, Plaintiff
and Appellant,

v.

David R. KNUDSON, Northwestern Bell
Telephone Company, Joe Elmore and
U.S. West Direct, Defendants and Ap-
pellees.

Nos. 15723, 15740 and 15743.

Supreme Court of South Dakota.

Argued Nov. 16, 1987.

Decided July 27, 1988.

David V. Vrooman, Sioux Falls, for plaintiff and appellant.

James E. McMahon, Sioux Falls, for defendants and appellees David R. Knudson and Northwestern Bell Telephone Co.

John E. Simko, Sioux Falls, for defendants and appellees Joe Elmore and U.S. West Direct.

TUCKER, Circuit Judge.

Plaintiff, Darrell K. Wangen (Wangen), appeals from a trial court's order granting defendants' motion for new trial unless Wangen accepted a reduction in the amount of punitive damages awarded by the jury. Defendants, David R. Knudson (Knudson), Northwestern Bell Telephone Company (Northwestern Bell), Joe Elmore (Elmore), and U.S. West Direct (U.S. West) have filed notices of review alleging that the trial court erred in denying their motions for directed verdict and judgment notwithstanding the verdict. Elmore and U.S.

West also allege that the trial court gave prejudicial and erroneous jury instructions. We affirm the order denying directed verdicts and judgment notwithstanding the verdict and reverse the order granting a new trial unless the remittitur was accepted.

## FACTS

From 1977 to 1985 Wangen was one of the top salesmen for U.S. West. In 1983 and 1984, however, Wangen began to suffer from bouts of severe depression. Because of his depression, his job performance began to deteriorate. He uncharacteristically fell behind in the completion of sales calls, and customer complaints began to appear. Although he had consumed alcoholic beverages earlier in his life, Wangen quit drinking in 1977. In June 1984 Wangen started to drink beer again. His drinking made him feel better and helped him escape from his problems. He usually drank alone in his motel room, but he never drank at home or on weekends.

Because of concern over his depression and sudden change in alcohol consumption, Wangen saw Dr. Peters, a physician, in August 1984. Dr. Peters conferred with Dr. Arbes, a psychologist, and they admitted Wangen to McKennan Hospital. Wangen did not notify U.S. West that he was going to be admitted to the hospital nor that he would be missing work. While he was hospitalized, Wangen was also treated by Dr. Gehlhoff, a psychiatrist. Wangen was discharged from the hospital four days later. The doctors prescribed medication for his depression and recommended that Wangen take some time off from work. At no time did any of the doctors who treated Wangen diagnose him as an alcoholic. Wangen's hospitalization was the first time he missed work because of illness since starting to work for U.S. West.

Wangen disregarded the doctors' advice to take some time off and returned to work. The following day, he met with his supervisor, Elmore, to discuss his hospitalization. Prior to this meeting Wangen's wife had expressed concern to Elmore about her husband's drinking. When El-

more met with Wangen, he suggested that Wangen visit with Knudson, the counselor and employee assistance program/chemical dependency coordinator for Northwestern Bell in Sioux Falls. Although Northwestern Bell and U.S. West are separate and distinct corporations, they had entered into a contract where Northwestern Bell provided U.S. West with services from its medical department.

Wangen met with Knudson and a company nurse, Bev Rohl. Knudson asked Wangen questions concerning Wangen's prior history of drinking and the recent change in his drinking habits. Knudson told Wangen that his recommendation was that Wangen submit to in-patient alcohol treatment for 30 days or face termination of his employment. Elmore was present when Knudson gave this recommendation to Wangen. Knudson asked Elmore if his recommendation was correct, and Elmore signified that it was something Wangen was going to have to face. Knudson told Wangen that he was an alcoholic and that Wangen needed to quit denying it because alcoholism is a disease of denial. Both Elmore and Knudson knew that Wangen had just been hospitalized for depression, was under Dr. Arbes' and Dr. Peters' treatment, was taking medication for his depression, and was still extremely emotional.

At this point Wangen became extremely upset. He was told to make a decision before leaving the office. When Wangen asked for more time, he was told he could have until four o'clock that afternoon to make his decision. Wangen requested the opportunity to call his wife. While Wangen was speaking to his wife (who lived at the family residence in Rapid City), Knudson picked up the extension and told her that her husband was an alcoholic and that since the spouse of an alcoholic uses the same method of denial as an alcoholic, he expected her to reject this.

Wangen left the meeting and went to visit Dr. Arbes. Although Dr. Arbes had spoken to Knudson and consented to Knudson meeting with Wangen, he was surprised that Knudson had determined that Wangen should undergo alcohol treatment.

Dr. Arbes recommended that Wangen call Knudson from his office and get a postponement on the decision until Dr. Arbes could speak to Knudson. Wangen phoned Knudson and asked for a postponement, but was told postponing his decision was the same as a rejection of Knudson's recommendation. Knudson then added Elmore to the phone conversation and told Elmore that Wangen was rejecting the recommendation. Knudson asked Elmore if he agreed that this rejection meant the loss of Wangen's job. Elmore agreed and told Wangen to come down to Elmore's office and turn in his equipment. Wangen did this.

Although Wangen had been told he was being fired, he never actually was. His wife was notified the next day that he had not been fired, and Wangen was told this by his wife. Wangen received his normal pay for the entire time he was out of work, a period of five weeks. This incident added to Wangen's depression and required continued treatment.

Wangen commenced this action against Knudson, Northwestern Bell, Elmore and U.S. West for the intentional infliction of emotional distress. The jury returned a verdict against them and awarded Wangen compensatory damages of $30,000.00 and punitive damages of $100,000.00. Following the defendants' motion for judgment notwithstanding the verdict, or in the alternative a new trial, the trial court ruled that the compensatory damages award should stand, but that Wangen must accept a remittitur for the punitive damage award in the amount of $70,000.00 or face a new trial on all issues.

## ISSUE I

DID THE TRIAL COURT ABUSE ITS DISCRETION WHEN IT ORDERED A NEW TRIAL SUBJECT TO WANGEN'S ACCEPTANCE OF A REMITTITUR? WE HOLD THAT IT DID.

The trial court held that the compensatory damage award of $30,000.00 did not appear to be the result of either passion or prejudice, and was within the limitations justified by the evidence. However, the

trial court held that the punitive damage award of $100,000.00 was excessive and that the plaintiff had to accept a remittitur of $70,000.00 within 14 days or a new trial would be granted on all issues.* Wangen alleges that the trial court improperly substituted its judgment for that of the jury, and, therefore, the court's order granting defendants' motions for a new trial unless Wangen accepted a remittitur was improper.

 This court need not address the issue of whether the remittitur was properly ordered. The trial court granted defendants' motion for a new trial unless within 14 days after service on Wangen's attorney of a copy of that order, Wangen filed a written consent to reduce the punitive damage award. Wangen did not file such a consent and appealed to this court. The filing of an appeal from an order of a remittitur is an indication of a plaintiff's intention to reject the remittitur. *See Harmon v. Motors Insurance Corp.*, 493 So.2d 1370 (Ala.1986). Thus, this court must determine whether the granting of defendants' motion for a new trial based on excessive punitive damages was proper.

The test to be employed by trial courts in determining when damages are excessive is contained in *Schuler v. City of Mobridge*, 44 S.D. 488, 493, 184 N.W. 281, 283 (1921):

> The damages, therefore, must be so excessive as to strike mankind at first blush, as being beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line; for they have no standard by which to ascertain the excess.

*Ruple v. Brooks*, 352 N.W.2d 652 (S.D. 1984); *Klug v. Keller Industries, Inc.*, 328 N.W.2d 847 (S.D.1982). "This obviously creates an extremely difficult burden for anyone attempting to overturn a verdict on the ground of excessive damages." *Brewer v. Mattern*, 85 S.D. 356, 365, 182 N.W.2d 327, 332–333 (1970). We are mindful that the trial court in passing upon the reasonableness of the jury verdict has had the benefit of hearing and observing the same things as the jury, has had the opportunity to observe the jury itself for signs of passion and prejudice, and has considered the amount of the verdict. *Id.* For this reason the trial court has wide discretion in granting a new trial based upon excessive damages. *Hulstein v. Meilman Food Industries*, 293 N.W.2d 889 (S.D.1980).

 The cases, however, maintain two important distinctions that courts should note when reviewing new trial motions. First, if the trial court granted the motion for a new trial, review by the appellate court is more stringent than if the motion were denied. *See Rabun v. Kimberly–Clark Corporation*, 678 F.2d 1053 (11th Cir.1982); *Evers v. Equifax*, 650 F.2d 793 (5th Cir.1981). Second, although the abuse of discretion standard governs regardless of the grounds for which the new trial is requested, new trials granted because a jury verdict is against the weight of the

---

* In its order the trial court set forth six reasons for its decision:

1. The compensatory damage award was substantial and would to some extent punish defendants.
2. The mitigating circumstances, including the admitted deterioration of Wangen's job performance; Mrs. Wangen's call to the supervisor suggesting that Wangen was experiencing alcohol problems, Wangen's admission that he was engaging in solitary drinking on the job; the checking with Dr. Arbes before recommending a course of action; the fact that Wangen did not, in fact, lose his job and other factors which should operate to reduce the punitive award.
3. The fact that the claimed wrong was accomplished by employees of the defendant corporations, rather than by their officers and directors tends to lessen the importance of the financial worth of the corporations.
4. The close questions of "good faith" and "motive" negative the enormity of the wrong, which at best is peculiar to the individual and is dependent in large measure on his interpretation of what occurred.
5. As against the actual alleged wrongdoers, the award was greater than necessary to deter others from similar acts.
6. The award offends the court and appears to have been made under the influence of passion and prejudice and without support in the evidence.

evidence must be distinguished from new trials ordered for other reasons: for example, improperly introduced evidence, other extraneous improper disclosures to the jury such as prejudicial statements by counsel, an improper charge to the jury, or newly discovered evidence. *Lind v. Schenley Industries, Inc.,* 278 F.2d 79 (3d Cir.1960).

In the first instance given it is the jury itself which fails properly to perform the functions confided to it by law. In the latter instances something occurred in the course of the trial which resulted or which may have resulted in the jury receiving a distorted, incorrect, or an incomplete view of the operative facts, or some undesirable element obtruded itself into the proceedings creating a condition whereby the giving of a just verdict was rendered difficult or impossible. In the latter instances ... the trial court delivered the jury from a possibly erroneous verdict arising from circumstances over which the jury had no control. Under these circumstances there is no usurpation by the court of the prime function of the jury as the trier of the facts and the trial judge necessarily must be allowed wide discretion in granting or refusing a new trial.

But where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to that extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts. It then becomes the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial. Such a close scrutiny is required in order to protect the litigants' right to a jury trial.

*Id.,* 278 F.2d at 90. *See also Williams v. City of Valdosta,* 689 F.2d 964 (11th Cir.); *Payton v. Abbott Labs,* 780 F.2d 147 (1st Cir.1985); *Crane v. Consolidated Rail Corporation,* 731 F.2d 1042 (2nd Cir.1984).

In this case we apply the closer scrutiny scope of review and we find that the trial court erred in granting defendants' motion for new trial based on excessive punitive damages.

Five factors have a bearing upon the amount of punitive damages:

1. The amount allowed in compensatory damages;
2. The nature and enormity of the wrong;
3. The intent of the wrongdoer;
4. The wrongdoer's financial condition;
5. All of the circumstances attendant to the wrongdoer's actions.

*Ruple v. Brooks, supra.* Punitive damages must be relatively large to accomplish the objective of punishing the wrongdoer and deterring others from similar wrongdoing. *Hulstein v. Meilman Food Industries, supra.* There is no precise mathematical ratio between compensatory and punitive damages. *Syester v. Banta,* 257 Iowa 613, 133 N.W.2d 666 (1965). The allowance and amount of punitive damages turns on the particular facts of each case. *Claude v. Weaver Construction Co.,* 261 Iowa 1225, 158 N.W.2d 139 (1968). Punitive damages must not be oppressive or so large as to shock the sense of fair-minded men, *Oppenhuizen v. Wennersten,* 2 Mich. App. 288, 139 N.W.2d 765 (1966), but they may considerably exceed compensatory damages. *Syester v. Banta, supra.*

Applying the factors to be considered with the facts in this case, this court first notes that the compensatory damages were substantial. The jury returned a verdict in favor of Wangen in the amount of $30,000.00. The trial court determined that this award of compensatory damages was not the product of passion and prejudice and was supported by the evidence. The punitive damage award of $100,000.00 is three and one-third times the compensatory damages, but is not disproportionate. This

court has previously approved punitive damage awards much more disproportionate to the compensatory damages than those found here. *See Hulstein v. Meilman Food Industries, supra* (punitive damage award about eleven times the compensatory damages affirmed); *K & E Land and Cattle, Inc., v. Mayer,* 330 N.W. 2d 529 (S.D.1983) (compensatory damages of $199.60 and $7,000.00 punitive damages affirmed); *Ruple v. Brooks, supra* (punitive damages three times compensatory damages affirmed).

Further, the jury finding the liability issue in favor of the plaintiff established that defendants acted intentionally or recklessly causing severe emotional distress to Wangen. The jury had the opportunity to weigh the nature and enormity of the wrong and the intent of the wrongdoers against the mitigating circumstances set forth in the trial court's order. The trial court cannot substitute his opinion as to the weight of the evidence in place of the jury's verdict. *Borras v. Sea–Lane Service, Inc.,* 586 F.2d 881 (1st Cir.1978).

Two of the defendants in this case are Northwestern Bell and U.S. West. To say the least, these corporations are substantial and an award of $100,000.00 for punitive damages is not out of line with their ability to pay. There is substantial evidence supporting an award of punitive damages.

Finally, the trial court did not find that the punitive damage award was "so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous," or "flagrantly outrageous," or "extravagant." *Schuler v. City of Mobridge, supra.* It concluded that "[t]he award offends the court and appears to have been made under the influence of passion and prejudice...." The trial court did not make a finding that the punitive damages were unreasonable, outrageous or extravagant. The court's finding of passion and prejudice is not a sufficient finding by itself upon which to grant a new trial.

Under the circumstances of this case, we find that the award of $100,000.00 for punitive damages was not excessive and the trial court abused its discretion in granting a new trial. The order granting a new trial is reversed.

## ISSUE II

DID THE TRIAL COURT ERR IN REFUSING TO GRANT DEFENDANTS' MOTIONS FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT? WE HOLD THAT IT DID NOT.

Defendants argue that the evidence Wangen produced was insufficient to support the denial of their motions for directed verdict and judgment notwithstanding verdict. Specifically, defendants allege that there was no substantial credible evidence which showed that their actions were done willfully and intentionally for the purpose of producing mental pain and anguish and the evidence failed to establish that their conduct was unreasonable.

When reviewing a ruling on a directed verdict or judgment notwithstanding verdict, this court views the evidence in a light most favorable to the non-moving party. *Sabag v. Continental South Dakota,* 374 N.W.2d 349 (S.D.1985); *Ebert v. Fort Pierre Moose Lodge # 1813,* 312 N.W.2d 119 (S.D.1981); *Smith v. Halverson,* 273 N.W.2d 146 (S.D.1978). Upon such a review, the evidence and inferences therefrom are viewed in a light most favorable to uphold the verdict. *Ebert v. Fort Pierre Moose Lodge # 1813, supra; United States Fire Insurance Co. v. Dace,* 305 N.W.2d 50 (S.D.1981). If there is competent and substantial evidence to support the verdict, it must be upheld. *Id.* If there is enough evidence to allow reasonable minds to differ, then the granting of such motions is inappropriate. *Ruple v. Brooks, supra.* The trial court's rulings on these type of motions is presumed to be correct, and this court will not seek reasons to reverse. *Sabag v. Continental South Dakota, supra; Lytle v. Morgan,* 270 N.W.2d 359 (S.D.1978). Thus, this court presumes that the evidence Wangen produced was sufficient to establish a prima facie case for the tort of intentional infliction of emotional distress.

To allow recovery for this tort, the following elements must be present: (1) the act causing the anguish was done intentionally; (2) the act was unreasonable; (3) the actor should have recognized it as likely to result in emotional distress. *Ruane v. Murray*, 380 N.W.2d 362 (S.D.1986); *Ruple v. Brooks, supra.* It has also been stated that "there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which especially calculated to cause, and does cause, mental distress of a very serious kind." *Ruple, supra* at 654, *citing* Prosser, Handbook of the Law of Torts § 12 (4th Ed.1971). Section 46(1) of the Restatement (Second) of Torts, which this court has previously cited with approval (*See e.g. Ruane v. Murray, supra; Ruple v. Brooks, supra*) provides in part that "one who by extreme and outrageous conduct intentionally or *recklessly* causes severe emotional distress is subject to liability for such emotional distress...." (Emphasis supplied.) Liability may attach where a defendant engages in "reckless" conduct, conduct which constitutes a deliberate disregard of a high degree of probability that the emotional distress will follow. Restatement (Second) of Torts § 46, comment (i). The actions of defendants sufficiently demonstrate a reckless disregard of a high probability that Wangen would suffer emotional distress. Under these circumstances, Wangen was only required to show that defendants intentionally or recklessly acted in a manner which would create an unreasonable risk of harm to him, and that they knew or had reason to know of facts which would lead a reasonable man to realize that such actions would create the harm that occurred.

Defendants also argue that there was no evidence that their conduct was unreasonable or outrageous. In support of this contention, they cite *Hubbard v. United Press, Inc.*, 330 N.W.2d 428 (Minn.1983) and *Northrup v. Farmland Industries, Inc.*, 372 N.W.2d 193 (Ia.1985). Both of these cases dealt with plaintiffs who brought a lawsuit against their former employers under the theory of intentional infliction of emotional distress. Each plaintiff had alcohol related problems and were discharged from their jobs because of inadequate performances.

However, the facts of those two cases are clearly distinguishable from the situation involving Wangen. Wangen was suffering from, and being treated for, severe depression at the time of the confrontation with Knudson and Elmore. Both Knudson and Elmore had knowledge of Wangen's condition. In *Hubbard, supra,* and *Northrup, supra,* neither plaintiff was suffering from any type of emotional problem. Neither employer had reason to know that their actions would cause emotional distress to those employees. This court in citing to the Restatement (Second) of Torts § 46, Comment (f), has stated that "the extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is particularly susceptible to emotional distress by reason of some physical or mental condition or peculiarity." *Ruane v. Murray, supra,* 380 N.W.2d at 364. Actions which may not make an actor liable in one situation may make him liable in another. *Id.* Here, both Knudson and Elmore had knowledge of Wangen's mental condition at the time of the meeting. This evidence was sufficient for a jury to determine that the conduct of Elmore and Knudson was "extreme and outrageous."

Elmore and U.S. West further allege that the evidence was insufficient to establish that Wangen suffered from severe emotional distress. The evidence shows that Wangen was susceptible to emotional distress at the time of the incident, that he became extremely distraught when told that he must undergo alcohol treatment or face termination, that he missed five weeks of work after the incident, and that he continued to be treated for depression for some time afterwards. The record reflects that both Dr. Ford and Dr. Gehlhoff, two psychiatrists who treated Wangen after the incident, believed that the incident involving Knudson and Elmore added to, and worsened, the depression from which Wangen had already been suffering. These facts clearly establish sufficient evidence so that reasonable minds

could differ on whether Wangen suffered from emotional distress.

We are convinced that there was sufficient evidence to support the verdict and defendants' motions for directed verdict and judgment notwithstanding the verdict were properly denied.

## ISSUE III

DID THE TRIAL COURT GIVE ERRONEOUS INSTRUCTIONS WHICH WERE PREJUDICIAL TO DEFENDANTS? WE HOLD THAT IT DID NOT.

■ Defendants Knudson and Northwestern Bell allege that certain jury instructions given by the trial court were erroneous and prejudicial to defendants. Specifically, they allege that Instruction 13 is an incorrect statement of the law, and that Instruction 16 is a misstatement of the law as applied to the facts of this case.

Instruction 13 reads:

In an action for the intentional infliction of mental distress the plaintiff may recover for his mental pain, though he had no physical injury when the following elements are present:

 1) the act causing the anguish was done intentionally;

 2) the act was unreasonable; and

 3) the actor should have recognized it is as likely to result in emotional distress.

Instruction 16 reads:

In order to establish that a defendant intended to inflict emotional distress, the act must have been committed under such circumstances that it can be said that the actor consciously realized that the conduct would in all probability (as distinguishable from possibility) produce the precise result which it did produce and would bring harm to the plaintiff.

Defendants allege that these instructions allowed the jury to find in favor of Wangen without making a determination that defendants' actions were done for the purpose of producing mental pain and anguish. This legal issue is addressed, in part, in Issue II. Further, instructions to the jury must be considered as a whole. When as a whole they give a full and correct statement of the law applicable to the case, they are not erroneous although the particular instructions taken alone may not have embodied all the applicable law. *Mueller v. Mueller,* 88 S.D. 446, 221 N.W.2d 39 (1974). Instruction 12 of the instructions states in part "the plaintiff has the burden or proving that the defendants' actions were intended to produce mental pain and anguish." When Instructions 13 and 16 are read together with Instruction 12, the jury was properly instructed.

The case is remanded for reinstatement of the jury verdict awarding Wangen punitive damages.

MORGAN, SABERS and MILLER, JJ., concur.

HENDERSON, J., concurs in result.

TUCKER, Circuit Judge, sitting for WUEST, C.J., disqualified.

HENDERSON, Justice (concurring in result).

Blurring of precedent can inadvertently take place. *Schuler,* cited in the majority opinion, is not a punitive damages case. It is not authority for, nor can it be any authority, pertaining to punitive damages or excessive punitive damages.

*Ruple,* cited in the majority, involved punitive damages. *Ruple,* as here, pertained to the tort which is termed "intentional infliction of emotional distress." The third amended complaint in this case alleged the conduct of defendants was willful, malicious, and oppressive with intent to cause plaintiff severe pain and distress.

*Hulstein,* cited in the majority opinion, is the leading South Dakota case on punitive damages and depicts five factors, set forth in the majority opinion, which are likewise set forth in *Ruple,* 352 N.W.2d at 656.

Precedent springs, *inter alia,* from other decided cases on the same subject or South Dakota statutes or legal treatises or authority outside of this state. I believe that it is important, for those who read our opinions in other jurisdictions, to examine

our statute, in light of this decision. It is SDCL 21–3–2 and it provides:

> *Punitive damages in discretion of jury.* In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, *actual or presumed*, or in any case of wrongful injury to animals, being subjects of property, committed intentionally or by willful and wanton misconduct, in disregard of humanity, the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant. (Emphasis added.)

As I read this case over, I am struck with the fact that three doctors, including Dr. Arbes, a psychologist, and Dr. Gehlhoff,[1] a psychiatrist, all examined and treated plaintiff Wangen. This treatment was for depression; there was no diagnosis or treatment for alcoholism. Defendants/appellees took it upon themselves to have a company nurse and counselor (not doctors or psychologists or psychiatrists) undertake a company examination which wound up with an admonition to Wangen that he had to go to alcoholic treatment for some thirty days or face termination. Wangen's wife was very upset and cried at this turn of events and Wangen drove that night, in his car, from Sioux Falls, starting first for the Western part of the state and then returning to Sioux Falls; thence he drove to Pipestone, Minnesota, Beresford (South Dakota), Hartford (South Dakota), and thence back to Pipestone, Minnesota, calling his wife from pay phones during the course of the night. A travel agency received a letter expressing that Wangen could no longer travel on company credit. Wangen was also told to turn in his gear, which he did, so Wangen definitely believed that he had been terminated. According to the testimony, he had a difficult time functioning as a human being because of this so-called medical department, within a corporate structure, which mandated an arbitrary treatment. Elmore, defendant/appellee, admitted that the medical situation of Wangen had turned into some type of a contest between Wangen's doctor and Knudson, defendant/appellee. Knudson, the company counselor, was not licensed as a counselor, nor was he a psychologist or a psychiatrist. It appears from the trial transcript that there was knowledge within the corporate ranks that Wangen had been treated by Dr. Arbes at McKennan Hospital in Sioux Falls, South Dakota. It appears that this company counselor and Wangen's supervisor interfered with Dr. Arbes' professional treatment. Needless to say, the jury did not like it and believed that Wangen had met his proof of establishing severe mental pain and distress. Perhaps the moral of the story is: Corporate America can go too far in regulating the medical treatment of its employees and, thus, actually interfere with its employees' choice of doctors/treatment. Wangen was apparently paying for his medical services, out of his own pocket, to cure his depression. Our state capital is at Pierre, South Dakota, and is also the situs for "River Park," a well-known chemical dependency treatment center. Pierre is centrally located in South Dakota. Wangen, while in the corporate offices, was told by his supervisor that he must make a decision before he left his chair as to whether or not he would go to River Park in Pierre or its facility in Rapid City or another chemical dependency unit in his hometown of Sioux Falls. Sioux Falls is in extreme eastern South Dakota. I draw the reader's attention to *Ruane v. Murray*, 380 N.W.2d 362, 364 (S.D.1986), which enumerates three elements of the tort of intentional infliction of emotional distress: "(1) the act causing the anguish was done intentionally; (2) the act was unreasonable; and (3) the actor should have recognized it as likely to result in emotional distress."

Lastly, I note the rationale of the trial court mentions that "[t]he compensatory damage award was substantial and would to some extent punish the Defendants."

---

1. Dr. Gehlhoff is the Chairman of the Psychiatry Department at the St. Joseph Hospital in Chicago; he was in private practice in Sioux Falls when this incident took place. Dr. Gehlhoff agreed with Dr. Arbes' diagnosis that Wangen was depressed. Dr. Gehlhoff opined that Wangen was not an alcoholic and had never been an alcoholic.

This, in my opinion, is a conceptual error: Compensatory awards are to make a party whole for a *detriment* sustained (SDCL 21–3–1 [2]); whereas, punitive damages are an award of damages by way of setting an *example and to punish/deter* (SDCL 21–3–2). We should not intermix these two awards into a hybrid that blurs the distinction set by the Legislature in SDCL §§ 21–3–1 and 21–3–2.

**2.** SDCL 21–3–1 provides:
 For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the *detriment* proximately caused thereby, whether it could have been anticipated or not. (Emphasis added.)