2000 SD 1

**Tim ENGELS, Plaintiff and Appellee,**

v.

**RANGER BAR, INC., Defendant and Appellant.**

**No. 20926.**

Supreme Court of South Dakota.

Considered by Briefs Nov. 29, 1999.

Decided Jan. 5, 2000.

David R. Strait of Austin, Hinderaker, Hopper, Strait & Bratland, Watertown, South Dakota, Attorneys for plaintiff and appellee.

Gregory J. Stoltenburg of Gunderson, Evenson & Boyd, Clear Lake, South Dakota, Attorneys for defendant and appellant.

SABERS, Justice.

[¶ 1.] The trial court found Ranger Bar, Inc. (Ranger) made fraudulent representations to Tim Engels which induced Engels to buy the Harbor Bar from Ranger. Compensatory and punitive damages were awarded to Engels and Ranger appeals. We affirm.

## FACTS

[¶ 2.] In 1980, Calvin Rhody and John Homan purchased the Harbor Bar in Watertown, South Dakota. While the building was built in the early 1900s, the Harbor Bar has existed since the 1940's. Rhody and Homan ran the bar as a limited partnership and decided to incorporate in June of 1982 under the name Ranger Bar, Inc.

[¶ 3.] In 1993, Ranger sold the bar to Bill and George Holmes on a contract for deed – $100,000 down and $300,000 on contract. Holmes experienced financial problems and, in July of 1995, asked Ranger to release them from the contract for

deed. Ranger agreed and took the bar back.

[¶ 4.] Ranger listed the property with a realtor for over a year before deciding to sell it at a public auction on July 27, 1997. Engels became interested in purchasing the property in June of 1997. He testified that Rhody agreed to finance the sale through a contract for deed only if Engels purchased before the auction. Rhody disagreed and testified that a contract for deed was an option even if the property were sold at the auction. The auction bill, prepared by Haan–Kline, the auctioneer, is not in the record.

[¶ 5.] Engels was in the bar several times inquiring about the property and inspecting the business. He testified that, on one occasion, he asked Rhody about the roof and Rhody told him that the roof had been repaired except around the skylight, which would be repaired after the sale. On a different occasion, Engels offered Rhody $25,000 less than his asking price because Engels heard that the roof leaked. Rhody assured him that they had spent all kinds of money on the roof and it had been repaired except for a leak around the skylight. Engels further testified that he tried to get on the roof one day to inspect it, but Rhody had the key to access the roof and he was not available. Engels visually inspected the interior of the bar and stated he could not see any signs of water damage within the interior walls – the sheetrock was new and the walls and ceiling were recently painted. He also observed that he could not see any daylight through the roof. Engels did not have any knowledge of the drain on the roof or the pooling of water on the roof when the drain became obstructed with ice.

[¶ 6.] Engels also questioned the realtor about the condition of the roof on two different occasions. The realtor relayed what Rhody had told him: "the roof had been repaired except [that] it leaked [around] one of the skylights, and he'd fix that."

[¶ 7.] On July 25, 1997, Engels signed a Purchase Agreement to purchase the Harbor Bar from Ranger. It stated: "Buyer has inspected this property and agrees to purchase it in its as is condition." On August 4, 1997, the parties entered into a contract for deed. The "as is" provision was incorporated therein. Engels agreed to pay $300,000 for the property with $100,000 down and $1,672.90 per month until September 4, 2007 when a balloon payment of $139,550.52 was due. The contract for deed also included the following clause:

### REPRESENTATIONS

It is agreed and understood by and between the parties hereto that this agreement is based upon the purchasers personal inspection and investigation of the property involved and the ledgers and books of the Sellers and not upon any representations or warranties of the Seller other than set out herein.

Engels took possession of the bar on August 4, 1997.

[¶ 8.] During the fall of 1997, Engels noticed water leaking through the roof. By late January 1998, the roof severely leaked. Engels and his employees had to place twelve to twenty garbage cans and buckets around the bar to catch the water. The garbage cans and buckets needed to be dumped periodically. Sheetrock on the ceiling leaked and cracked. Ceiling tiles had to be replaced. Engels finally hired Utne Construction to replace the roof and drainage system, which was completed on February 5, 1998, at a cost of $33,777.61.

[¶ 9.] Rhody later admitted that he had, on occasion, placed several buckets around the bar to catch the water leaking through the roof. He explained that the roof was flat and there was a six-inch drain hole where the water runs off the roof.[1] In the winter, the ice obstructed the drain hole creating a pool that saturated the roof in certain areas. This was not an unexpected event to Rhody. In 1986, he repaired the

---

1. The roof was not actually flat; it was four feet higher on one side than on the other side.

roof and had a black elastomeric coating (alumination) applied in 1990, 1992, 1993, 1995, 1996 and March of 1997.[2] He stated that if he had problems with the roof, he'd "just go put another coating on and seal them [the leaks] up." He further stated:

> You know, there was no doubt it [the roof] was a pain in the winter. In the summer most of the time if we got it coated good we had no problem, but if you had a bad winter where it would melt early and then it wouldn't run off that drain. It's that simple.

Rhody acknowledged that Engels asked him whether the roof leaked and Rhody testified: "I told him I just got done coating it. There was still a leak in the skylight and that I would coat that and stop it from leaking." The contractor, Utne, testified at trial that the application of elastomeric was as effective as painting over rust; it did not remedy the problem.

[¶ 10.] The trial court found that Ranger represented that the roof had been fixed except for a leak in the skylight. It stated: "[t]he representations on the condition of the roof by [Ranger] were not true, not warranted by the information known only to [Ranger] and a suppression of the actual truth." Thus, Engels was awarded damages for fraud under SDCL 53–4–5 and for deceit under SDCL 20–10–1. The court awarded him $33,776.61 in compensatory damages, $3,720.16 in prejudgment interest and $10,000 in punitive damages. Ranger raises three issues.

## [¶ 11.] 1. WHETHER THE TRIAL COURT WAS CLEARLY ERRONEOUS IN FINDING THAT THE REPRESENTATIONS WERE INTENDED TO INDUCE ENGELS TO BUY THE PROPERTY.

■ [¶ 12.] Ranger points out that the conversation with Engels about the roof lasted about one minute. It argues that Engels could not have altered his decision to buy this property based on this one-minute conversation. It further argues that Engels had some duty to inspect the property himself and that Rhody offered to show Engels the receipts of the repairs, but Engels declined to see them. Ranger also claims that the provisions of the contract for deed provide that there are no agreements other than the ones within the contract and that bars this action.

[¶ 13.] Engels responds that he did inspect the property and he saw no signs of water damage. The sheetrock was new and the walls were recently painted. When Rhody offered to show him the receipts of the "repairs," Engels accepted the offer, but the receipts had been left at Rhody's house. He further argues that the condition of the roof had to be concealed or else Ranger would not have received the full $300,000 from him. Furthermore, Engels argues Ranger knew of the severe problems since 1990 when it started using alumination; in fact, Ranger put alumination on the roof right before the sale to give it a clean, shiny appearance even though it knew that alumination did not remedy the leaks. Finally, Engels relies on *Holmes v. Couturier*, 452 N.W.2d 135 (S.D.1990) for his argument that the contract provisions do not shield Ranger from liability on the theory of fraud and reliance.

■ [¶ 14.] Our standard of review is well established:

> Our standard of review of the trial court's findings of fact is under a clearly erroneous standard. *Jasper v. Smith*, 540 N.W.2d 399, 401 (S.D.1995); *Muh-*

---

**2.** One witness, Jim Utne, the contractor who installed the new roof for Engels, described alumination as a coal-coating product. It is namely used to reflect the sun and to protect the felt. However, the alumination alone will not seal the seams from cracking; when it gets cold, the alumination contracts and cracks (which process is called alginate). It is effective only if it is used on a roof that is already in good condition and if cheesecloth is laid down first so the product can bond to it. This roof was not in good condition and cheesecloth was not applied.

*lenkort v. Union County Land Trust,* 530 N.W.2d 658, 660 (S.D.1995). The trial court's findings will not be disturbed unless the court is 'firmly and definitely convinced a mistake has been made.' *Jasper,* 540 N.W.2d at 401. Conclusions of law, on the other hand, are reviewed under a de novo standard, giving no deference to the trial court's conclusions of law. *Id.*

*Wood v. SD Cement Plant,* 1999 SD 8, ¶ 9, 588 N.W.2d 227, 229 (quoting *City of Colton v. Schwebach,* 1997 SD 4, ¶ 8, 557 N.W.2d 769, 771).

[¶ 15.] Ranger argues that this suit is controlled by the provisions of the purchase agreement and the contract for deed which state that this property was sold "as is." We agree with Engels that "as is" provisions do not shield Ranger from liability for fraudulent representations. In *Holmes,* we stated: "[a] provision in a contract that the buyer takes the property as is does not confer on the seller a general immunity from liability for fraud." *Holmes,* 452 N.W.2d at 137 (citing *Lingsch v. Savage,* 213 Cal.App.2d 729, 29 Cal.Rptr. 201 (1963); *see also Massler v. Smit,* 279 A.D. 941, 943, 111 N.Y.S.2d 264, 266 (1952) (stating: "[f]raud will vitiate any contract, regardless of the fact that the contract contains a provision to the effect that ... the party who claims the fraud entered into the contract with knowledge of the condition of the subject matter of the contract and agrees to accept the same 'as is.'"); *Wolford v. Freeman,* 150 Neb. 537, 547, 35 N.W.2d 98, 103 (1948) (noting that "[a] contract provision that the buyer takes the property as is does not prevent fraudulent representations from invalidating the contract.")). Thus, Ranger is not allowed to use the purchase agreement or the contract for deed to shield itself from liability for fraud. *Id.* Furthermore, Ranger may not invoke the parol evidence rule to prohibit the introduction of evidence of fraud. *Id.*

[¶ 16.] SDCL 53–4–5 provides that fraud, in relation to contracts, occurs when "[t]he suggestion as a fact of that which is not true [is made] by one who does not believe it to be true." Deceit occurs when "[o]ne [ ] willfully deceives another, with intent to induce him to alter his position to his injury or risk...." SDCL 20–10–1. The existence of fraud or deceit is a question of fact for the fact finder. *Holmes,* 452 N.W.2d at 137; SDCL 53–4–5 (stating "[a]ctual fraud is always a question of fact.").

[¶ 17.] In reviewing the record in this case, it is clear that the trial court was not clearly erroneous in finding Rhody's "representations concerning the roof were made with the intention that Mr. Engels would rely on them and purchase the bar for the price [at which] it had been listed...." Ranger wanted $300,000 for the Harbor Bar. Engels offered to pay $275,-000 because he heard that the roof leaked. Ranger, through Rhody, represented that lots of money had been spent on the roof and that it had been repaired; therefore, he was not willing to take anything less than $300,000. It is true that a lot of money had been spent on the roof, however, the "repairs" were limited to coating the roof with alumination, a process which occurred as often as needed to keep up with the leaks. The trial court further found that "Rhody knew that the roof had been coated with a substance which had proven ineffective in stopping the perennial leaking." Thus, he "knew that the leaky roof had not been repaired."

[¶ 18.] Contrary to Ranger's argument, there is no minimum time requirement in order to prove fraud or deceit. The fact that one conversation between Engels and Rhody concerning the roof lasted only one minute also supports the contention that Rhody's assurances were sufficiently strong to satisfy Engels' doubt about the condition of the roof and induced him to purchase the property for $300,000 without reservation and without an adequate inspection.

[¶ 19.] The trial court's findings are sufficient to prove fraud and deceit in this case. The trial court's findings will be upheld unless they are clearly erroneous and these findings are not. *Holmes,* 452 N.W.2d at 137. Therefore, we affirm Issue 1.

[¶ 20.] **2. WHETHER THE TRIAL COURT WAS CLEARLY ERRONEOUS IN FINDING THAT ENGELS REASONABLY RELIED ON THE REPRESENTATIONS.**

[¶ 21.] The trial court found that Engels relied on Rhody's representations and agreed to purchase the bar. It further found that Engels' reliance was reasonably justified.

[¶ 22.] Ranger argues that Engels should have used due diligence in inspecting the property before he purchased it. Ranger claims that Engels purchased a 90 to 100 year old building for $300,000 and did not inspect the roof nor did he have a contractor inspect it for him. It further claims Engels negotiated extensively regarding the terms of the contract for deed, such as liquor license and permits, personal property and video lottery profits. Yet, Engels claims to have relied on representations concerning the roof even though the roof was never even mentioned within the contract, except for repair of the skylight. In other words, if the condition of the roof was so important to Engels he should have at least obtained a written assurance or guarantee on it. Essentially, Ranger concludes, Engels buried his head in the sand and cried fraud the minute he was dissatisfied with the written agreement.

[¶ 23.] Engels, on the other hand, argues that he reasonably relied upon the statements of Rhody and Ranger's realtor, as well as his own inspection of the interior of the property. Engels asserts that when he inquired about the condition of the roof, Rhody told him that the leaks had been repaired except the skylight. He testified that had he known about the severe leaking problem, he would not have offered $300,000 for the property.

[¶ 24.] We apply the same standard of review as in Issue 1. A trial court's findings of fact are reviewed pursuant to the clearly erroneous standard while the conclusions of law are reviewed de novo. *Wood,* 1999 SD 8, ¶ 9, 588 N.W.2d at 229.

[¶ 25.] In *Holmes,* the question arose whether the plaintiff failed to exercise reasonable inquiry into the condition of the property. We stated: "negligence in trusting a representation will not excuse a positive willful fraud." *Holmes,* 452 N.W.2d at 137 (quoting *Omaha Nat'l Bank v. Manufacturers Life Ins. Co.,* 213 Neb. 873, 882, 332 N.W.2d 196, 202 (1983); *see also Estate of Jones by Blume v. Kvamme,* 430 N.W.2d 188, 193 (Minn.Ct.App.1988), *aff'd in part, rev'd in part,* 449 N.W.2d 428 (Minn.1989) (stating "[a] person is justified in relying upon a false representation, although he might have ascertained its falsity had he made an investigation"); *Cedar Falls Bldg. Center, Inc. v. Vietor,* 365 N.W.2d 635, 639 (Iowa Ct.App.1985) (holding "[w]hen an individual acts on the representations of another and relies on them in good faith, he has no duty to further investigate.")). As long as Engels reasonably relied upon the fraudulent representations of Ranger, "the reasonableness of his inquiry is irrelevant." *Id.*

[¶ 26.] Therefore, we affirm Issue 2.

[¶ 27.] **3. WHETHER THERE IS SUFFICIENT EVIDENCE TO SUPPORT THE AWARD OF DAMAGES.**

[¶ 28.] **A. Compensatory Damages**

[¶ 29.] The trial court awarded compensatory damages to Engels in the amount of $33,777.61. Ranger argues that this award was excessive as Engels contracted to purchase a building that was 90 to 100 years old with a roof that might last four to six years; now he has a new roof with a ten-year guarantee, which amounts to a windfall. Engels offered Ranger $25,-

000 less than his asking price due to concerns with the roof. Engels admitted that had the roof been in the condition as represented, it would only last four to six years before it needed work. However, with the new roof, Engels received a ten-year written guarantee. Therefore, Ranger argues the award was excessive and Engels should receive only what he expected when he entered into the contract, i.e., $25,000. There is some merit to Ranger's argument but no evidence as it failed to show that the roof could have been repaired less expensively.

[¶ 30.] An award of compensatory damages must not be the product of passion and prejudice and must be supported by the evidence. *See Wangen v. Knudson*, 428 N.W.2d 242, 244 (S.D.1988). One who deceives another by asserting a fact that he knows is not true is subject to damages beyond contract limitations. SDCL 20–10–1; *Hoff v. Bower*, 492 N.W.2d 912, 914 (S.D.1992) (stating "compensatory damages are available under the tort of intentional or fraudulent misrepresentation"); *Trautman v. Coffman*, 39 S.D. 628, 632, 166 N.W. 150, 151 (1918) (stating "[t]he right to damages for deceit as in other tort actions is founded upon the theory of full compensation for the injury sustained.").

[¶ 31.] In this case, there was sufficient evidence to support the award of $33,777.61, the cost of replacing the roof. As indicated above, there was no showing the roof could have been properly repaired in a less expensive manner. The trial court found Ranger made fraudulent and deceitful representations that the roof had been repaired in order to avoid a $25,000 reduction in the purchase price. It further found that Engels reasonably relied on these fraudulent and deceitful representations. Ranger fails to show the existence of passion or prejudice or that other error occurred when the court awarded Engels the replacement cost of the roof.

[¶ 32.] **B. Punitive Damages**

[¶ 33.] Ranger asserts that the punitive damage award of $10,000 was excessive. It contends that the "totality of the circumstances does not justify a punitive damage award of any kind." It also claims, in effect, that Engels already received one windfall in the form of a new roof and should not receive another.

[¶ 34.] In reviewing whether a punitive damage award is excessive, we consider five factors:

1. The amount allowed in compensatory damages;
2. The nature and enormity of the wrong;
3. The intent of the wrongdoer;
4. The wrongdoer's financial condition; and
5. All of the circumstances attend[ing] to the wrongdoer's actions.

*Wangen*, 428 N.W.2d at 246 (citation omitted). "Punitive damages must be relatively large to accomplish the objective of punishing the wrongdoer and deterring others from similar wrongdoing." *Id.* (citing *Hulstein v. Meilman Food Industries*, 293 N.W.2d 889, 892 (S.D.1980)). *See also Hoff*, 492 N.W.2d at 914–15 (holding an award of punitive damages was proper where defendants were found liable for intentional or fraudulent misrepresentation). However, the award must not be oppressive or so large that it shocks the "sense of fair-minded men." *Wangen*, 428 N.W.2d at 246 (citation omitted).

[¶ 35.] In this case, the compensatory damages were $33,777.61. The fraudulent representations resulted in financial harm to Engels – an unexpected replacement of a leaky roof which was potentially harmful to his business. Ranger intended to conceal the condition of the roof to avoid a substantial discount in the selling price. Finally, Ranger's financial condition is good; it owns some property near Lake Poinsett, personal property and the balance of the contract for deed with Engels is approximately $175,000.

[¶ 36.] Reviewing all of the above factors, there is no showing that the punitive damage award of $10,000 was excessive. Therefore, we affirm Issue 3.

[¶ 37.] Affirmed.

[¶ 38.] MILLER, Chief Justice, and AMUNDSON, KONENKAMP and GILBERTSON, Justices, concur.