PIPER, Respondent v. BARBER TRANSPORTATION COMPANY, Appellant

(112 N.W.2d 329)

(File No. 9866. Opinion filed December 4, 1961)

**Davenport, Evans, Hurwitz & Smith,** Sioux Falls, for Defendant-Appellant.

**G. F. Johnson,** Gregory, **Wm. F. Day, Jr., Maule & Maule,** Winner, for Plaintiff-Respondent.

SMITH, P. J. A transport truck of defendant overtook and ran upon a farm tractor operated by plaintiff on U. S. Highway 18 near Okreek in Todd County, South Dakota, on October 6, 1956. Plaintiff was thrown backward high in the air and landed on his lower back on the blacktop highway. A protruding intervertebral disk subsequently developed which necessitated surgery to remove the disk and fuse the two lowest vertebrae with the sacrum. In this action plaintiff sought and recovered judgment on the theory that the protruding disk and other injuries were caused by the described collision. At the trial the defendant admitted its liability for whatever damages plaintiff sustained as the proximate result of the collision, and such was the issue submitted to a jury. It returned a $39,529.29 verdict for plaintiff. Subsequently to the entry of judgment the defendant made and the trial court denied an application for a new trial. A partial development of facts will be useful in the treatment of several of the matters urged by defendant. Other facts will be brought out in connection with particular contentions.

The force of the collision wrecked the farm tractor and jackknifed the transport into the ditch. Plaintiff testified that while in the air, with his feet uppermost, he looked through his crotch and watched the transport go forward and into the ditch. As it passed him it struck his elbow. After landing on his back, he was unconscious for a brief

period, and thereafter was suffering severe pain in his back and elbow, and was made uncomfortable by burns from battery acid which was splashed over his person.

At the Winner hospital, where he was taken, he was examined by Dr. Studenberg. Although he was in obvious pain when he attempted to move his torso, X-rays then taken and read by the doctor revealed no abnormalities he could detect except a broken toe. Plaintiff was released from the hospital the following day. Rest on a firm bed and sedation for pain was prescribed. A brace purchased at the local drug store was suggested as support for the back. When he was next seen by Dr. Studenberg in connection with these injuries on November 23, 1956, he was complaining of weakness and numbness in his arm and persistent stiffness and soreness in the lumbar region of his back, all dating from the October 6, 1956 collision. He was then referred to Dr. Van Demark of Sioux Falls, an orthopedic specialist. He remained in the care of this doctor for a period just short of a year during which the doctor saw him ten times.

The first examination included X-rays. The doctor continued the use of the brace purchased at Winner and built up one shoe. Plaintiff was told to return in thirty days. In January 1957 the doctor placed plaintiff in a cast jacket which caused him to walk with a slight stoop. He wore this jacket in its original state for two months and thereafter for a period so cut as to permit its temporary removal. Thereafter he wore a brace prescribed by Dr. Van Demark. Duing this time activity and work were encouraged by the doctor. Plaintiff testified that work would produce such intense pain he had to lie down. Periods of reduced activity brought relief from suffering he said.

On April 22, 1957 while plaintiff was in the care of Dr. Van Demark, and while wearing the opened jacket cast he was kicked by a horse. He received a glancing blow in the chest. Two days later, because of soreness in the chest, he consulted Dr. Studenberg at Winner. It was found that cer-

tain ribs had been torn from the breastbone. The doctor applied an elastic bandage which relieved the pain. This was the only treatment plaintiff received for this injury. He testified that he suffered no back injury as a result of this blow. Dr. Studenberg confirmed and corroborated this opinion of the plaintiff.

Late in 1957 Dr. Van Demark referred plaintiff to the Mayo Clinic at Rochester, Minnesota. He reported there December 16, 1957. Dr. A. J. Bianco, Jr., the doctor in charge, testified he gave a history of the collision of October 6, 1956, above described, and complained he had since suffered almost constant low back pain and down the right thigh to the back of the knee. Both plaintiff and Dr. Bianco testified that the reason plaintiff was referred to the Clinic by Dr. Van Demark was because of the complaint of low back pain radiating down a leg. A thorough examination, including the reading of X-rays then taken, followed. There was a tenderness at the right sacroiliac area of the spine. Flexion of the spine was moderately limited forward, backward and to both sides. The X-rays disclosed what was described as "wear changes" in the lower joints between the lowest lumbar vertebrae and the sacrum, and some narrowing of the space ordinarily occupied by the vertebral disk at the lowest disk space in the back.

An intervertebral disk was described by the doctor as a cushion or shock absorberlike structure which lies between each of the vertebrae throughout the spine. It is made of cartilage or gristle and has a soft center, surrounded on the outside by a firm rind. A protrusion of a disk, he said, looks somewhat similar to a bulge seen in an inner tube where there is a weak spot. In other words, the soft material bulges or pushes out through the weak spot in the rind.

From his original examination the doctor formed an opinion that plaintiff most likely had a protruded or herniated intervertebral disk at the lowest level of the spine. Thereupon a neurologist was called in consultation, and

following his examination he advised a myelogram be performed as a further diagnostic procedure. However, as plaintiff had an infected skin area at the base of his spine this procedure was delayed until plaintiff's return to the Clinic on February 12, 1958.

The doctor described a myelogram as a "test whereby an attempt is made to outline the disk protrusion, * * * by inserting a needle into the column of fluid around the spinal cord, just behind the disk. Into this column dye is injected which shows up on x-rays, or air is injected which also shows up on x-ray, as being different from the ordinary fluid column at this area. If a disk is protruding from between the vertebrae, it often appears as a bulge, pushing into the dye or into the air column which has been injected."

Such a myelogram was done, using air, on February 12, 1958. It revealed a slight bulge at the lowest level and a possible bulge at the next level. Therefore, based on the facts revealed by their examinations, the doctors undertook a surgical exploration of the lower disk spaces. It disclosed a protruded disk at the second lowest space in the back which was compressing nerve roots running to the leg. Other damage to this area of the spine was revealed by these examinations. The described disk was removed, grafts were taken from the pelvic bone and placed in beds, then prepared, through the last two vertebrae and into the sacrum. After healing these grafts acted as a bridge fusing these two vertebrae and the sacrum. The doctor said, "A large block of bone is taken with a sharp instrument and then cut in two broad strips and placed across the disk spaces in a prepared bed like small barrel staves or little bridges of bone." He also said that although the last disk was not removed, both disk spaces had to be fused, because fusing of a single disk would have placed an unusual strain on the other, and it is difficult to fuse the fourth lumbar disk without extending the fusion to the sacrum.

The significance of a patient's complaint to the examining doctors of pain radiating down the back of

his right leg to the knee was explained by the examining doctor at the Clinic in these words, "Since the sciatic nerve courses down the back side of the leg, pain in the back of the thigh coming from the back and buttock is often called sciatica. This complaint, with other findings and examination suggests irritation of a nerve root or roots in the spine * * *."

Following the surgery of February 12, 1958, plaintiff was dismissed from the hospital February 27, 1958, and returned to the Mayo Clinic on August 27, 1958 and again February 17, 1959. From those examinations, and plaintiff's complaints the examining doctor testified that the pain in the leg had disappeared; pain in the back was experienced after operating a tractor all day; and there was a permanent partial disability of the spine of approximately twenty per cent.

The plaintiff was 23 years old at the time of the collision and resided on a ranch with his wife and two children. He had always been engaged in farming and ranching and had been trained for no other occupation. He testified that from the date of the collision his back pained him and if he was required to move quickly the pain would go down the back of his right leg to his knee and the leg would feel numb for a few seconds. He testified further that this condition continued to grow worse thereafter.

Dr. Studenberg testified that although he would have regarded such a symptom as significant he made no record of plaintiff's complaining of pain radiating down the right leg. He said he was not sure plaintiff did not call this symptom to his attention. He also said that such pains may have been of such a degree as to cause plaintiff to be aware of them, but not to cause him to complain to the doctor. He also testified that no such complaint was made by plaintiff when he was later examined in connection with the horse kick.

In response to hypothetical questions both Dr. Bianco of the Mayo Clinic and Dr. Studenberg expressed the

opinion that the collision of October 6, 1956 caused plaintiff's injury. In cross-examination and dealing with the possibility that the horse kick above described may have been the cause, or a contributing cause, defendant brought out the opinion of Dr. Studenberg that he did not think plaintiff would necessarily have developed radiating pain down his leg within a matter of a few weeks at most, if the collision was the cause. He testified, "So much depends on how severe the rupture of the casing (the rind) was to start with, and that determines how soon it will be before the casing ruptures, and that also is modified by how much activity he does or if he does nothing after the original weakening of the rind. * * * Just being on his feet or doing whatever he would normally do, it is consistent that with a weakened casing to this disk would over a period of six months or even a year eventually produce symptoms." And further, he said when asked by defendant's counsel, "You think it is consistent that the injury caused this syndrome later on?" Dr. Studenberg answered, "It is completely consistent."

■ ■ The first contention argued by defendant is that the trial court erred in refusing to grant it a new trial on the ground of newly discovered evidence.

The plaintiff did not call Dr. Van Demark as a witness on his behalf at the trial. Our statutes provide

> "A physician or surgeon, * * * cannot, without the consent of his patient, be examined in a civil action as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient;"

SDC 1960 Supp. 36.0101(3), and that

> "If a person offer himself as a witness he thereby waives any privilege he might otherwise claim, which would prevent the examination of his * * * healing practitioner on the same subject within the meaning of the subdivisions * * * (3) * * * of section 36.0101. * * *"

SDC 1960 Supp. 36.0102.

Plaintiff offered himself as a witness at the trial. After the trial defendant procured from Dr. Van Demark an affidavit which reads in part as follows:

> "That Affiant examined the above named Plaintiff when he was referred to Affiant by Dr. Stutenburg of Winner, South Dakota; that such examination was made approximately eight weeks after Plaintiff was involved in an accident between a farm tractor and a motor truck on October 6, 1956; that said examination included an examination of x-rays of Plaintiff, the giving of certain tests to the Plaintiff, including a Lasegue, and a careful examination of the back of the Plaintiff; that in said examination Affiant found no evidence of any pressure upon the nerve endings in the lumbar region of Plaintiff's spine, or of any pressure being exerted upon the sciatic nerves by any protruding or ruptured disc; that, based upon his knowledge, training and experience, Affiant is of the opinion that at the time of such examination of Plaintiff by Affiant, Plaintiff had no protruding or ruptured intervertebral disc which was exerting pressure against any nerve roots or was irritating any nerve roots in the lumbar region of the Plaintiff's back."

Because pain in the lumbar region of the back radiating down a leg is recognized as a cardinal symptom of a protruding intervertebral disk, and Dr. Van Demark is ready to testify that he found no evidence of such a symtom, counsel for defendant asserts that the doctor's testimony would negative the existence of the symptoms plaintiff testified he suffered from the time of the collision, and might well produce a different result. It is also said that because the testimony of the doctor was privileged until plaintiff took the stand, it could not, in view of time and distance factors, have been discovered and produced at the trial by the exercise of reasonable diligence.

A cause for granting a new trial is "Newly discovered evidence, material to the party making the application, which he could not with reasonable diligence have discovered and produced at the trial;" SDC 1960 Supp. 33.1605(4). Applications for new trial on this ground are not favored by the courts and are entertained with reluctance. Gaines v. White, 1 S.D. 434, 47 N.W. 524; and 39 Am.Jur., New Trial, § 156 p. 162. Such an application is addressed to the sound judicial discretion of the trial court and its ruling will not be disturbed on appeal except for manifest abuse of discretion. Dacotah Packing Co. v. Bertelson, 52 S.D. 324, 217 N.W. 393; Island v. Helmer, 63 S.D. 362, 258 N.W. 812; Behringer v. Muchow, 72 S.D. 80, 30 N.W.2d 5; and Museus v. Geyer, 75 S.D. 381, 66 N.W.2d 63.

The exercise of the trial court's discretion rests not only on a determination of whether the evidence is in fact newly discovered, and such as could not with reasonable diligence have been produced at the trial, as indicated by the words of the statute but, as was held in Island v. Helmer, supra, on whether there is reasonable probability that the evidence would be believed by a jury, and if so whether there is a reasonable probability it would produce a different result. All these factors, except one, were brought into play by the facts before the trial court when it denied a new trial. We do not doubt that the trial court acted under the assumption that a jury would believe Dr. Van Demark was expressing an honest opinion.

Certain facts which were before the trial court were not open to reasonable question. Plaintiff unquestionably did have a protruding intervertebral disk which was compressing a nerve root leading to the right leg at the time Dr. Van Demark referred him to the Mayo Clinic in December 1957. The complete diagnostic procedure followed by the Clinic was necessary to place this fact beyond question. Neither Dr. Van Demark nor Dr. Studenberg had succeeded in discovering this fact. Plaintiff unquestionably suffered a severe blow to the lumbar region

of his back October 6, 1956 in the described collision which could have weakened the rind to the described intervertebral disk. Dr. Studenberg's testimony, brought out by defendant, that the syndrome indicating a protruding disk can develop gradually over a period of time depending on the degree of the original rupture of the rind and the nature of the patient's subsequent activity is not disputed in the record. Further, the testimony of Dr. Studenberg that it is inconceivable that the kick of the horse, (which occurred several months after plaintiff became the patient of Dr. Van Demark) could have caused injury to the lumbar section of plaintiff's back stands uncontroverted. Dr. Van Demark's affidavit indicates no change in symptoms or complaints during the period of his treatments.

Inferences were open to the trial court predicated on other facts.

The care indulged by counsel for defendant in cross-examination of Dr. Studenberg with reference to complaints by plaintiff of low back pain radiating down his legs suggests that counsel made like inquiries of Dr. Van Demark. It is noteworthy that the affidavit prepared by counsel and sworn to by Dr. Van Demark does not state that such a complaint was not made by plaintiff to him. As indicated supra Dr. Bianco testified that plaintiff was referred to the Mayo Clinic by Dr. Van Demark because of such a complaint.

Further, in September 1959, several months before the trial, which began on March 8, 1960, counsel for defendant conducted a cross-examination of plaintiff. At that time plaintiff testified, "Well, after the accident when I was doctoring with Dr. Vandemark he told me **he couldn't find anything wrong with me * * *.**" Thereafter and before the trial counsel for defendant inquired of counsel for plaintiff if he intended to take the deposition of Dr. Van Demark. On October 26, 1959 counsel for plaintiff replied, "At the present time I am not inclined to take the deposition of Dr. Van Demark" and he did not thereafter

take the depostition of the doctor. The plaintiff took the stand as the first witness in his own behalf and gave testimony dealing with the treatment administered by Dr. Van Demark. The trial lasted three days. Although the place of trial is located some 200 miles from Sioux Falls where Dr. Van Demark resides and practices, because the offices of the firm of attorneys who appear for defendant were also located in Sioux Falls, immediate contact with Dr. Van Demark during the trial offered little difficulty.

Predicated on these and other facts we have stated, the trial court in our opinion could reasonably have concluded that: (1) Counsel for defendant were forewarned that Dr. Van Demark might testify to facts and opinions which would prove to be of importance to the defense; (2) because doctor's deposition had not been taken, and the expense of producing him as a witness at the trial would not be inconsiderable, they must at least have regarded such an appearance as a witness for plaintiff as improbable; (3) they could not have failed to know that plaintiff would testify in his own behalf and that such testimony would comprehend treatment received at the hands of Dr. Van Demark, and thus the doctor would become available to the defense as a witness; (4) The time which elapsed during the trial after plaintiff had so testified was sufficient to have permitted a member of the firm representing defendant to consult with the doctor and arrange for his appearance at the trial; (5) counsel for defendant made no such attempt to consult with the doctor until after the trial; and (6) because the diagnostic procedure and surgery of the Mayo Clinic demonstrated that the honest opinion formed by Dr. Van Demark, and expressed in his affidavit, was probably at war with the actual fact, it is extremely improbable that his testimony would produce a different result if a new trial were had. Hence, we are unable to say that the trial court abused its discretion in ruling the showing of newly discovered evidence insufficient to warrant a new trial.

 Complaint is made that hypothetical questions propounded to medical witnesses assumed facts contrary to or unsupported by the evidence.

The governing rule was stated in Dean v. Seeman, 42 S.D. 577, 176 N.W. 649, 651 as follows:

"The propriety of allowing hypothetical questions rests largely in the discretion of the trial court, and, where such questions are allowable, it is the duty of the trial court to see that they are properly framed, that they are responsive to the issues in question, and that they assume only such facts as are supported by some evidence in the record. Whether such facts have been actually proven is a question for the jury to decide. But the party framing such questions should be allowed a fairly wide latitude, so long as he keeps within reasonable bounds as to his theory of the case and the evidence supporting such theory. The opposing party has the right to rebut the facts assumed, as well as the testimony of the witness."

We have held it sufficient if the testimony in the record tends to prove the facts assumed. Erickson v. Webber, 58 S.D. 446, 237 N.W. 558, 80 A.L.R. 914; and see 58 Am.Jur., Witnesses, § 854, p. 482.

The assumptions about which complaint is made in this court are "that since the accident of October 6, 1956, that he had noticed almost constant pain in the lower right lumbar area and right buttock, and that the pain radiated down the posterior aspect of the right leg to the area of the knee;" and that "there had been no incident since the date of the accident--no subsequent accident or injury to his back". The last mentioned assumption was questioned in the trial court. We do not find where objection was made to the first above quoted assumption in the trial court. However with the governing rule in mind we have made a careful study of the record. In our

opinion the record tends to support both assumptions. Indubitably, a finding of some radiation of pain down the right leg must rest upon plaintiff's testimony. Although he complained at the outset of severe pain in the lumbar region of his back, and it was obvious to Dr. Studenberg that he was in great pain when he attempted to move his torso just after the accident, perhaps the weight of the evidence is that he made no complaint from the outset to Dr. Studenberg of radiation down his right leg. However the evidence tends to prove that he felt such radiations from the outset when required to move quickly. In this connection the testimony that plaintiff was unable to do his farm work dating from the collision, and that when, pursuant to the urging of Dr. Van Demark, he attempted to work, such activity brought on intense pain, cannot be ignored.

It is true that a horse kick inflicted a glancing blow and injury to plaintiff's chest in April 1957. However, plaintiff and Dr. Studenberg who examined him following this injury testified he suffered no back injury as a result of that blow. Hence the second assumption finds support in the evidence.

We are of the opinion the trial court did not err in ruling on these hypothetical questions.

The contention is made that in view of defendant's admission of liability for whatever injuries and damages plaintiff sustained as the proximate result of the collision, the court erred in receiving evidence dealing with the collision.

Because a colorless admission may have the effect of depriving a party of the legitimate moral force of his evidence, and for other reasons, Dean Wigmore suggested many of such cases offer room for the exercise of sound discretion on the part of a trial court. IX Wigmore, Evidence, § 2591 and see 88 C.J.S. Trial § 58, pp. 163, 164; and 53 Am.Jur., Trial, § 105, p. 93. In the circumstances at bar, we discern neither error nor prejudice. The admission

of defendant did not remove the issue of damages, nor the sharply contested question of whether the injuries demonstrated at the Mayo Clinic were the proximate result of the collision. The evidence admitted over the actual objections of defendant tends to indicate the force with which the tractor and plaintiff were struck, the manner in which plaintiff's body was twisted as it was catapulted high in the air, the height to which he ascended, and the character of the blow the lumbar section of his back received when he landed on the blacktop highway. We deem that which the California court wrote in Fuentes v. Tucker, 31 Cal.2d 1, 187 P.2d 752, at 755, as applicable here:

> "It follows, therefore, if an issue has been removed from a case by an admission in the answer, that it is error to receive evidence which is material solely to the excluded matter. This, of course, does not mean that an admission of liability precludes a plaintiff from showing how an accident happened if such evidence is material to the issue of damages. In an action for personal injuries, where liability is admitted and the only issue to be tried is the amount of damage, the force of the impact and the surrounding circumstances may be relevant and material to indicate the extent of plaintiff's injuries. * * * Such evidence is **admissible because it is relevant and material to an issue remaining in the case.**" (Emphasis supplied.)

■ ■ The contention is made that because the verdict is so extremely excessive as to indicate passion and prejudice, the trial court erred in failing to order a new trial. The facts which must control our consideration of this contention are revealed by the view of the evidence most favorable to plaintiff. They will be stated in more or less broad outline.

When injured the plaintiff was a healthy, rugged out-door twenty-three-year-old, who never had been

troubled with back discomfort and who gained pleasure from participation in athletics, hunting and riding horses. He had been the catcher on the local baseball team during the current season. His hunting included big and small game and he rode after the hounds. He and his wife were enthusiastic dancers. They lived with their children on a 320-acre rented farm which he operated as a farm and ranch. In addition, for the use of his father's machinery in his operations he assisted his father in the work of an 800-acre farm and ranch owned by his father, and at times helped his grandfather who operated a property nearby. He was just getting started in raising livestock and as he said he was "building up". He looked forward to a life in farming and ranching and was able to do everything involved in such an operation. He was trained for nothing else.

Change came into his life with this injury. In addition to a broken toe, an injured elbow, and unconsciousness, he suffered a rupture of the rind to an intervertebral disk in the lumbar region of his back. Although it was apparent that he suffered pain when he attempted to shift his torso, the nature and extent of his injuries were not revealed by the X-rays or by examination by his physician. He left the hospital after one day with the advice to apply a brace to his back, to rest, and to relieve his pain with sedation.

Finding himself unable to carry on with his farm work, he made arrangements with his brother to take over. That original agreement was for $200 for one month but because of plaintiff's continuing disability it was extended on a full-time basis for about two years, and thereafter on a job or hourly basis at the rate of $1.00 per hour.

Six weeks after the original injury, plaintiff returned to his doctor. The examination then made revealed he had lost about 25% of the motor function of the arm which had suffered the elbow injury, and his back was stiff and painful in the lumbar region. He was then referred to an orthopedic specialist of widely recognized qualifications. That physician urged him to engage in work activities. He

followed that advice but when he worked the pain would become so intense he would have to lie down. Either the original blow or that blow and his activities subsequent to that injury caused the soft material of the intervertebral disk to protrude and press the ruptured rind against a root or roots of the sciatic nerve. In this condition he continued to seek relief through the orthopedic specialist for about a year. Finally he was referred to the Mayo Clinic. There through the diagnostic procedures we have described the full extent of his injuries were finally determined and a spinal fusion was performed to relieve his suffering and to protect him from added injury. Six months of inactivity followed during which he wore an uncomfortable orthopedic brace, then there was a gradual return to work. For a period of months there was constant improvement in his ability to take over farm work. However, for many months before the trial his condition had remained static. His chief incapacity was in the ability to lean forward, and in lifting. Even attempting to carry a pail of milk or water would result in pain up the right side of his back. He continues to suffer pain in the lumbar region of his back when his body is jolted or jerked, when he has to sit in one position for an extended period, when he attempts to bend beyond the limitations now imposed upon his back and when he attempts to lift heavy objects. As the limitations imposed upon his back are permanent by intention, his incapacity will remain permanent, and to continue as a farmer and rancher will involve the permanent suffering of pain. He demonstrated the extent of his inability to bend his back before the jury. He testified that whereas before the injury he had been accustomed to put in long hours on a tractor, afterward he was limited to about a six-hour day in that work. Other work such as shearing or tagging sheep, building or repairing fences, stacking hay, chopping wood, etc., was described as work he found it either impossible or less possible to do in his disabled state.

Dr. Bianco of the Mayo Clinic testified that plaintiff's back as a whole has suffered a 20% incapacity through the injury and the surgery.

Dr. Studenberg agreed that the limitation of the whole back structure is moderate, but he explained that 95% of the function of bending of the back resides in the lumbar section. The ribs attached to the dorsal vertebrae render that section much less mobile. According to Dr. Studenberg the fusion of two-fifths of the lumbar section of plaintiff's back resulted in a permanent 40% reduction in the bending function of that section. This explanation of Dr. Studenberg caused counsel for defendant to inquire, "To summarize it, insofar as a disability of the man as a whole is concerned, it would be a great deal less than the amount of disability that you find in this one area", and produced the following response from the doctor, "I think that would be true, but I think it would depend on what occupation this individual is engaged in. If a man is doing a sedentary type of occupation he would have no disability, but a man who does an active type of work requiring a lot of bending would suffer more discomfort and disability because of the demands of his occupation, and it would alter considerably the extent to which he is disabled." The doctor testified further, "The one obvious, to me, at least, reason why he might have pain is because his back is limited by intent and since he has been obliged to make certain efforts he very likely puts undue strain on some other facets of his body in the remaining three-fifths of the mobile part of his spine. The damaged portion of his back has been fixed so that it could be relatively free of pain. That doesn't mean his back as a structure isn't going to have to pay a penalty for the misery of the injury plus the misery of the surgery." He said in substance that if plaintiff continues in farming and ranching he will continue to pay a considerable price in pain.

The plaintiff at the time of trial had a life expectancy of 40 years. He was before the jury and court throughout the trial and except for the demonstrated physical changes wrought by the injury and surgery appeared in good health. A realistic cumulative concept of the anxiety, pain and discomfort which has been and will be visited throughout his working days cannot be reflected by the words of

witnesses, counsel or this court. Dr. Studenberg used the term "misery" in describing the original injury and the surgery. By this term we understood him to comprehend not only pain but the anxiety which accompanied a search for the cause of his pain and in submitting to such a delicate major operation. Plaintiff referred to more or less constant low back pain radiating down his right leg during a considerable period before the surgery and during the period when he attempted to work, to pain so intense he was compelled to lie down. Dr. Studenberg referred to sciatic pain becoming "excruciating". For four days after the surgery the pain reached a point where plaintiff just couldn't stand it and narcotics gave only partial and temporary relief. He said the burning pain in the area of the hip bone where material was taken for use in the fusion was continuing at the time of the trial some two years after the surgery. The pain he suffers from jolts or by straining against the limitations of his back in lifting or bending is described as a sharp pain up the right side of his back. Discomfort results from sitting for extended periods. If he carries on in the only work for which he is trained he must bear with this pain and the threat of such pain during the remainder of his working days. This pain and disability which has changed his working days has in a considerable measure denied him past and future activities from which he gained keen pleasure.

In addition to reasonable compensation for pain, discomfort and anxiety suffered and to be suffered by plaintiff as a result of the injury, under instructions which became the law of the case because not questioned, there was submitted to the jury plaintiff's loss of past and future earnings, and his reasonable expenses in procuring medical, surgical and hospital services. Testimony indicated that the going wage for year around farm and ranch hands of the experience and qualifications of plaintiff and his brother was from $165 to $250 per month.

We have recognized that a trial court as a participant in the trial is in a better position than the members of

this court to sense whether a seemingly generous verdict in a case dealing with unliquidated damages has resulted from passion and prejudice. Tufty v. Sioux Transit Co., 70 S.D. 352, 17 N.W.2d 700. Therefore in instances where a trial court has overruled a motion for new trial predicated upon the contention that excessive damages have been allowed under the influence of passion and prejudice, we have adhered to the rule of review in Schuler v. City of Mobridge, 44 S.D. 488, 184 N.W. 281, 283, wherein it was said:

> "The damages, therefore, must be so excessive as to strike mankind, at first blush, as being beyond all mesaure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption."

Ross v. Foss, 77 S.D. 358, 92 N.W.2d 147; Morey v. Keller, 77 S.D. 49, 85 N.W.2d 57; Stene v. Hillgren, 77 S.D. 165, 88 N.W.2d 109; and Hotovec v. Howe, 79 S.D. 337, 111 N.W.2d 748.

With this rule of review, and the reduced purchasing power of the dollar (cf. Ross v. Foss, supra) in mind, we have made a most careful and painstaking study of the evidence, and as suggested by counsel, we have also made an unguided search in the authorities collected in 16 A.L.R. 2d 3 for helpful comparisons. From this study, we have concluded we are not warranted in holding this verdict to have been influenced by passion and prejudice.

Other contentions advanced by appellant have been considered by the court but are not deemed to merit discussion.

The judgment and order of the trial court are affirmed.

All the Judges concur.