**Gina K. STORMO, Plaintiff
and Appellee,**

v.

**Scott W. STRONG, Dale A. Tesch, and
Eunice M. Tesch, Defendants
and Appellants.**

**No. 17186.**

Supreme Court of South Dakota.

Argued Feb. 11, 1991.

Decided April 24, 1991.

Nancy J. Turbak of Turbak Law Office, Watertown, for plaintiff and appellee.

Ronald J. Wheeler of Wheeler Law Office, Huron, for defendants and appellants.

HERTZ, Acting Justice.

Scott W. Strong (Strong), Dale A. Tesch and Eunice M. Tesch (Teschs) (collectively referred to as defendants) appeal from a jury verdict awarding Gina K. Stormo (Stormo) $360,000 in damages for injuries she sustained in an auto accident. We affirm.

## FACTS

On June 30, 1986, Stormo was injured when the car in which she was traveling collided with a farm truck driven by Strong. At the time of the accident, Strong was acting within the scope of his employment with Teschs who owned the truck.

It is undisputed that Stormo's injuries were extensive, requiring thirteen days of hospitalization, including two days in intensive care. Her injuries included a crushed right arm, broken ribs, a punctured and collapsed right lung, a bruised left lung, a separation of both ends of her collar bone, an injured knee, and many bruises and abrasions. Stormo's shoulder blade was fractured, tendons in her neck were torn, her front teeth were knocked loose, and a bony wing on one of her vertebrae had been fractured. Because she was unable to care for herself when she was released from the hospital, family and friends provided home care for Stormo as she recuperated over the summer.

When Stormo returned to her treating physician, Dr. Jason Ostby, for a follow-up visit on July 16, 1986, he referred her to an orthopedic surgeon, Dr. Robert Suga. When Dr. Suga examined Stormo on July 31, 1986, he noted that due to the severity of the injury to her arm, it had healed at an angle, leaving her arm permanently bent. He also observed that her collarbone was permanently separated at both ends, increasing her risk of arthritis in the future, and contributing to a deformity of her shoulder. A deformity of the chest caused by Stormo's broken ribs made her right shoulder droop and caused asymmetry in her shoulders. Although Stormo initially regained full motion in her shoulder as a result of physical therapy, her condition deteriorated as scar tissue formed.

Six months after her accident, Stormo was examined by Dr. Ostby for a school physical. He observed that her arm was "noticeably deformed," and that she had a two-and-a-half inch scar above her right breast, and a scar on her back. Dr. Ostby also noted that Stormo's shoulder drooped and she complained of some pain.

On February 2, 1988, Stormo was examined by a second orthopedic surgeon, Dr. Dennis Johnson, on behalf of the insurance carrier for Strong and Teschs. Dr. Johnson observed the same injuries noted by Dr. Ostby and Dr. Suga, and concluded that Stormo had a twenty-six percent (26%) permanent partial physical impairment of the whole person. The parties were unable to reach a settlement, and this action was commenced on July 25, 1988. Prior to trial, Stormo indicated that she intended to call Dr. Johnson as a witness on her behalf. Defendants then sought an order permitting another adverse physical examination of Stormo by a doctor of their choice. The trial court denied this motion.

Also before trial, each party submitted a pretrial checklist, including a list of all witnesses to be called at trial. Stormo's list of witnesses included the following:

Tracy Stormo (Gina's sister);

. . . . .

One or more EMTs [Emergency Medical Technicians] from the Watertown Ambulance Service;

One or more of the nurses who attended Gina during her hospitalization at PLHC;

. . . . .

One or more additional siblings of Gina K. Stormo[.]

Later, after defendants obtained a continuance, they served Stormo with interrogatories requesting that each possible witness

be specifically identified. Stormo did so, listing by name two EMTs and twenty-nine nurses, among other potential witnesses.

Trial began on April 23, 1990, and continued through April 27, 1990. Some of the experts testifying on behalf of Stormo included Dr. Suga, Dr. Johnson, Mr. Richard Ostrander, a rehabilitation consultant, and Ralph Brown, Ph.D., an economist. Dr. Brown testified concerning Stormo's reduced earning capacity. In his testimony, Dr. Brown relied on Mr. Ostrander's opinion regarding the average annual loss of employability suffered by Stormo as a result of her injuries. Defendants' objection to Brown's testimony, based on improper foundation, was overruled by the trial court.

Also introduced at trial was the deposition of Dr. Suga which had been videotaped. During his deposition, Dr. Suga referred to three x-rays. Although they were not marked or included as exhibits to the deposition, the video camera operator attempted to film the x-rays during the deposition. The certificate of the video tape operator stated in part:

> I further certify that no changes, alterations or amendments have been made to the videotape, except that the three X-rays to which Dr. Suga referred in his deposition were videotaped again at the conclusion of Dr. Suga's testimony to obtain the most accurate depiction of those X-rays, and that taping of those X-rays was inserted at the appropriate place in the deposition to correspond to Dr. Suga's reference to each respective X-ray.

While in chambers, defendants objected by way of motion in limine to the admission of the video of Dr. Suga on the basis that it had been altered, but their motion was overruled. Defendants did not object when the video testimony was presented to the jury.

Testimony about Stormo's condition immediately following the accident was presented by a number of individuals, including Stormo's sister, Tracy (Stormo) West. Defendants objected to the testimony of Stormo's sister as cumulative, but this objection was overruled. Tracy then testified that when she arrived at the hospital she was just outside the emergency room when she "hear[d] Gina yelling in pain from whatever they were doing. I couldn't see inside or anything, but I could hear her yelling."

When Highway Patrolman Greg Ingemunson testified regarding his investigation, he referred to a diagram of the accident, an enlargement of his own sketch included in his accident investigation report. Immediately prior to Ingemunson's testimony, while in chambers, defendants objected to the use of the diagram and its reference to the stop sign that Strong had run. The court permitted the use of the diagram as demonstrative evidence used "for the purpose of showing how the collision happened to show the nature and extent of damages[.]" During Officer Ingemunson's testimony, he did not refer to the stop sign, the fact that Strong ran the stop sign, or the fact that Strong received a citation for the stop sign violation.

Dr. Dennis Johnson, the orthopedic surgeon who examined Stormo in 1988 on behalf of defendants' insurance carrier, testified by videotape deposition. Dr. Johnson testified about the severity of Stormo's injuries, and that "[i]t was [his] impression and [his] opinion that she had a 26 percent permanent partial physical impairment of the whole person." Immediately prior to presenting the videotape testimony of Dr. Johnson, defendants objected to the deposition, arguing that there was no foundation for Dr. Johnson's testimony regarding the impairment rating because the doctor failed to state that his opinion was based on reasonable medical certainty that the impairment was caused by the accident. This objection was overruled and the video was presented to the jury.

In submitting the case to the jury, the court included in its instructions a provision regarding the value of home care provided to Stormo by her family and friends. The jury was instructed to fix the amount of damages for any of the loss or harm proven to have been suffered by Stormo, including:

g. The reasonable value of necessary household services, nursing, and attendance that has been required as a result of the injuries. (In determining the value of services furnished by members of Gina's family or others, as unskilled nurses, the recovery is to be measured by what is customarily charged for similar work, according to your common knowledge.)

Defendants' objection to this instruction was overruled. Stormo's counsel also referred to the value of home health care services in her closing argument, estimating the value to be $3,500. After almost five hours of deliberation, the jury returned their verdict awarding Stormo damages of $360,000. Defendants then brought motions for a new trial and alternatively for remittitur, and sought to have the verdict set aside as excessive, being based on sympathy or prejudice. The court denied these motions, and judgment was entered for Stormo in the full amount awarded by the jury. This appeal followed.

### ISSUES

1. Did the trial court abuse its discretion in admitting the testimony of economist Dr. Brown?

2. Did the trial court err in refusing to order a second physical examination by a physician of defendants' choice?

3. Did the trial court abuse its discretion in admitting the video deposition of Dr. Suga into which video of three x-rays had been inserted?

4. Did the trial court abuse its discretion in not requiring pretrial disclosure of all trial witnesses by name?

5. Did the trial court abuse its discretion in admitting testimony of the victim's sister because it was cumulative?

6. Did the trial court abuse its discretion in permitting the use of a demonstrative diagram indicating the presence of a stop sign at the accident scene, when liability was admitted?

7. Did the trial court abuse its discretion in admitting the testimony of Dr. Johnson because it lacked proper foundation?

8. Did the trial court improperly instruct the jury on damages for home health care?

9. Were the damages awarded excessive, being based on sympathy or prejudice?

10. Did the trial court abuse its discretion in refusing to grant motions for a new trial or remittitur?

### ANALYSIS

*1. Testimony of Dr. Ralph Brown.*

Defendants contend that Dr. Brown's testimony concerning Stormo's future economic loss due to unemployability was inadmissible. Dr. Brown's testimony relied for its foundation on conclusions of rehabilitative therapist Mr. Ostrander regarding future annual loss of employment assuming either a high school education or, alternatively assuming a college education. Defendants argue that although Ostrander did testify at trial, he testified as to his findings in terms of the percentage reduction of employability suffered by Stormo, not in terms of weeks of annual loss of employment and, therefore, Dr. Brown's testimony which was based on weeks of annual employment lost, lacked foundation.

"The trial court's evidentiary rulings are presumed correct and will not be reversed unless there is a clear abuse of discretion." *Zepp v. Hofmann,* 444 N.W.2d 28, 31 (S.D.1989). Trial courts have broad discretion concerning the admission of expert testimony. *Id.* Also, while there must be some factual data to support the opinion of an expert, these facts need not be admissible in evidence to support the expert testimony. *Id.; State v. Gallegos,* 316 N.W.2d 634, 636–37 (S.D. 1982). Indeed, as SDCL 19–15–3 states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him [or her] at or before the hearing. If of a type reasonably

relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

In fact, "SDCL 19-15-4 permits expert opinions lacking in foundation[.]" *Zepp,* 444 N.W.2d at 31. SDCL 19-15-4 also provides, in part, that "[a]n expert witness may be required, on direct or cross-examination, to specify the data on which his [or her] opinions or inferences are based[,]" revealing the rule's purpose to "speed[ ] up the trial and permit[ ] the opposing party to attack a weak foundation on cross-examination." *Id.,* at 31, n. 3.

■ Defendants challenge the factual basis for Dr. Brown's testimony. Such challenges go to the weight of the evidence, not the admissibility of the evidence. *State v. Esslinger,* 357 N.W.2d 525, 528 (S.D.1984); *Martino v. Park Jefferson Racing Ass'n,* 315 N.W.2d 309, 313 (S.D. 1982). In fact, we have previously considered the admissibility of expert testimony regarding loss of earning capacity. *See Klug v. Keller Indus., Inc.,* 328 N.W.2d 847 (S.D.1982); *Martino, supra.*

In *Martino,* we recognized the factors to be considered by the jury in determining the measure of damages for loss of earning capacity and held that as long as the expert's testimony disclosed the basis on which his or her opinion of loss of future earnings relied, it is for the jury to determine the weight to be accorded such testimony. 315 N.W.2d at 312-13. In *Martino,* Dr. Brown (the same economist whose expert testimony is at issue here) was provided with the plaintiff's medical records which included a permanent partial disability rating of six percent. We concluded that the permanent partial disability rating provided a sufficient basis for the trial court to receive evidence from an economist regarding the loss of future earning

capacity. 315 N.W.2d at 311. Once it has been established that there is an adequate basis for an expert's testimony, it is then up to the trier of fact to determine the weight to be given to the expert's opinion and whether to award damages for loss of future earning capacity. *Id.* at 312.

■ In this case, Stormo amply established a factual basis for Dr. Brown's testimony. In addition to the testimony of Dr. Johnson establishing a twenty-six percent (26%) permanent partial disability rating, testimony by Mr. Ostrander indicated the reduction, due to her injuries, in the number of jobs which Stormo could perform in the current labor market. Mr. Ostrander provided two alternative evaluations of the reduced employability suffered by Stormo based on a high school education or advanced education attained by her. In fact, counsel cross-examined Mr. Ostrander on the differences in employability resulting from her differing educational level. The mere fact that Mr. Ostrander did not convert Stormo's reduced employment opportunities to future weeks of annual unemployment during his testimony does not change our analysis. *Martino* makes it obvious that Dr. Brown's testimony had sufficient support even without Mr. Ostrander's testimony.

Also, we observe that the jury was given the standard instruction regarding expert testimony.[1] They were instructed that they could determine the weight to be given Dr. Brown's testimony and that they could also disregard his opinion if they felt it was unsound. Absent evidence to the contrary, we must presume that the jury followed this instruction and properly applied it to their deliberations. *Hy–Vee Food Stores v. Scrivner, Inc.,* 381 N.W.2d 275, 282 (S.D.1986); *State v. Thomas,* 381 N.W.2d 232, 237 (S.D.1986). Dr. Brown's testimony presented a factual question

---

1. S.D. Pattern Jury Instruction 2-12 (1989) provides:

A witness who has special knowledge, skill, experience, training or education in a particular science, profession or occupation may give his opinion as an expert as to any matter in which he is skilled. In determining the weight to be given such opinion, you should consider the

qualifications and credibility of the expert and the reasons given for his opinion. You are not bound by such opinion. If you should conclude the reasons given in support of the opinion are not sound, or that the opinion is outweighed by other evidence, you may disregard the opinion entirely.

properly resolved by the jury. Thus, the trial court's decision to permit Dr. Brown's testimony was within the bounds of SDCL 19–15–3 and 19–15–4, and squarely within its discretion.

### 2. Second Physical Exam.

Defendants argue that it was an abuse of discretion for the trial court to deny their motion to compel Stormo to submit to a medical examination by "a physician whose testimony would then be used by [defendants] at trial." The trial court denied defendants' motion because Stormo had already been examined by a physician on their behalf, and good cause was not established for a second examination. However, they contend that because the examination was conducted in February, 1988, five months before this action was commenced, and because Stormo later had Dr. Johnson testify on her behalf, they are entitled to another medical examination pursuant to SDCL 15–6–35(a).[2] Stormo responds that the court cannot compel her to submit to additional examinations until defendants are finally able to obtain a more favorable medical expert's opinion for use at trial.

■ Decisions on whether to order a medical examination pursuant to SDCL 15–6–35(a), the equivalent of Fed.R.Civ.P. 35(a), are within the broad discretion of the trial court. *Coca–Cola Bottling Co. v. Negron Torres*, 255 F.2d 149, 153 (1st Cir. 1958); *Bucher v. Krause*, 200 F.2d 576, 584 (7th Cir.1953). The requirement that "good cause" be established to obtain a physical or mental examination of a party indicates that the moving party must establish a greater showing of necessity than to obtain other forms of discovery. 23 Am.Jur.2d *Depositions and Discovery* § 292 (1983). Here, defendants did not allege, for example, that they had reason to believe Stormo's injuries were less severe than she

contended, that her physical condition had changed since the first examination, that she had failed to fully submit to the first examination, or that existing medical reports were unreliable. In fact, defendants' request for a second medical examination was based on "the fact that [Stormo is] now using that expert [Dr. Johnson] as [her] own, plus the fact that [she had] no initial objection to the [second] examination but only as to the additional x-rays[.]"

■ SDCL 15–6–35(a) does not give defendants the right to compel Stormo to submit to additional medical examinations until they secure an expert who will agree with their theory of the case. *See Rutherford v. Alben*, 1 F.R.D. 277 (S.D.W.Va. 1940). *See also Grimm v. Gargis*, 303 S.W.2d 43 (Mo.1957). Considering the party's right to privacy and the need for accurate information, the number of examinations ordered by the trial court is to be held to a minimum. *Schlagenhauf v. Holder*, 321 F.2d 43, 51 (7th Cir.1963), *vacated on other grounds*, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964). In evaluating defendants' need for a second medical examination of Stormo, the trial court was cognizant of the fact that defendants had been provided with copies of all requested medical records and reports regarding Stormo's condition, and that Stormo had submitted to other examinations requested by defendants such as a functional capacity assessment. *See Martin v. Tindell*, 98 So.2d 473 (Fla.1957), *cert. denied*, 355 U.S. 959, 78 S.Ct. 545, 2 L.Ed.2d 534 (1958). Also, as Stormo points out in her brief, defendants were not deprived of any medical testimony on their behalf; rather, they chose not to present the testimony of their medical experts because it did not support their theory. On this record, we cannot say the trial court abused its discretion in refusing to order Stormo to submit to a second medical exam.

---

**2.** SDCL 15–6–35(a) reads:
 In an action in which the mental or physical condition of a party ... is in controversy, the court in which the action is pending may order such person or party to submit to a physical or mental examination or blood test by a physician. The order may be made only on motion for good cause shown and upon notice to the person or party to be examined and to all other persons or parties involved and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

### 3. Videotaped Testimony of Dr. Suga.

■ Next, defendants allege error in the admission of the videotaped testimony of Dr. Suga because the video was altered. After Dr. Suga's deposition was video-taped, the video technician videotaped again three x-rays that Dr. Suga had referred to during his deposition "to obtain the most accurate depiction of those X-rays." The x-rays were then inserted at the appropriate place in the deposition to correspond to Dr. Suga's reference to each respective x-ray.

As a factual matter, the alteration of the video was insignificant. A review of the video makes it clear that Dr. Suga was referring to the x-rays during his deposition and the alteration simply provided the best possible picture of the x-rays. Defendants have not alleged that the alteration resulted in a misrepresentation or prejudice, thus we can find no error in the admission of the video. We must point out, however, that we in no way condone the practice of altering videotaped testimony. Any essential changes must be made with the full knowledge and consent of the parties and the trial court. Any practice which may destroy the accuracy of evidence, and which has the potential for abuse as does videotape recording, must be avoided if the integrity of the trial process is to be maintained.

### 4. Pretrial Disclosure of Witnesses.

On her pretrial conference checklist dated July 24, 1989, Stormo did not list by name the nurses or her siblings (with the exception of Tracy Stormo) that she planned to call as witnesses at trial. Defendants made no objection to Stormo's list of witnesses at that time. Defendants assert that the trial court entered an order requiring identification of witnesses to be called at trial, and that the court abused its

discretion by not requiring Stormo to comply with the order. From the outset, we note that no such order appears in the settled record. We observe, however, that defendants later served interrogatories requesting that Stormo identify "[e]ach person who has knowledge of any of the factual matters involved in this case or who claims to be a witness or has any information concerning the matters of issue in this action," and that Stormo's response to this interrogatory listed forty-eight individuals.

Defendants' argument is not that they were unaware of persons called as witnesses at trial. They do not claim surprise or any similar prejudice. Rather, defendants contend that Stormo's list of potential witnesses was too long for them to confer with every possible witness and would have been an unnecessary waste of time. Simply put, defendants claim inconvenience.

■ Trial courts have the authority to establish local rules, such as those requiring submission of a pretrial conference checklist,[3] and where established, local rules should not be ignored. *Wirtz v. Hooper–Holmes Bureau, Inc.*, 327 F.2d 939, 943 (5th Cir.1964). *See* SDCL 15–6–16. Here, however, the trial court did not refuse to enforce a local rule requiring disclosure of witnesses. Stormo disclosed the names of persons having knowledge of the relevant facts as required by the local rule and SDCL 15–6–26(b). Defendants' argument is without merit.

### 5. Testimony of Stormo's Sister.

■ Defendants argue that the testimony of Stormo's sister Tracy (Stormo) West was cumulative, and that it was an abuse of the trial court's discretion to permit such testimony. It is contended that by permitting numerous witnesses to testify about Stormo's pain and suffering during the thirteen days she was hospitalized, the jury

---

**3.** In this case, the third judicial circuit has established a pretrial conference checklist form. Printed at the top of the form is the following: "PRE–TRIAL CONFERENCE CHECK LIST. A pre-trial conference check list shall be prepared by counsel for each party and furnished to the Court and opposing counsel at least *two business days* prior to the date set for the first pre-trial conference." (Emphasis in original.) Item 5 reads *"Witnesses—Nature of testimony and availability*: (List witnesses, state nature of their testimony, whether deposition has been taken or is desired, and availability of witness— notice required, location, any problems involved, etc.)."

was unduly influenced by sympathy and passion. *See* SDCL 19–12–3. During trial, defendants objected to this testimony as cumulative but their objection was overruled.

Cumulative evidence is evidence of the same character as evidence previously produced and which supports the same point. *State v. DeMarias*, 27 S.D. 303, 308, 130 N.W. 782, 784 (1911). *See State v. Gerdes*, 258 N.W.2d 839 (S.D.1977). After reviewing the testimony presented, we conclude that Tracy (Stormo) West's testimony was not cumulative. Tracy's testimony was brief and referred to her observations of her sister from outside the emergency room immediately following the accident. She testified that she could hear her sister yelling in pain from the emergency room. Although Dr. Ostby and an EMT testified about Stormo's condition in the emergency room, their testimony was limited to medical observations and neither mentioned that Stormo yelled out in pain. Thus, Tracy's testimony was not cumulative and was properly admitted.

### 6. Diagram Showing Stop Sign.

Next, defendants assign error to the use of a demonstrative diagram by Highway Patrol Officer Ingemunson, an enlargement of the diagram from his accident investigation report which showed the presence of the stop sign at the accident scene. Defendants contend that because they admitted liability it was improper to permit the use of a diagram showing the stop sign that Strong ran which caused the accident.

During his testimony, Officer Ingemunson did not refer to the stop sign, the fact that Strong ran the stop sign, or the fact that Strong received a citation for the stop sign violation. The diagram was not offered into evidence and was used only to illustrate the circumstances of the accident that caused Stormo's severe injuries. We have held that evidence of the details of an auto collision is admissible as relevant and material to the issue of plaintiff's damages, notwithstanding defendant's prior admission of liability. *Piper v. Barber Transp.*

*Co.*, 79 S.D. 353, 367, 112 N.W.2d 329, 336 (1961). *See Baltus v. von der Lippe*, 293 Minn. 99, 196 N.W.2d 922 (1972). The trial court properly permitted the use of the diagram pursuant to *Piper*.

### 7. Testimony of Dr. Johnson.

Next, defendants contend that the trial court abused its discretion in admitting the videotaped testimony of Dr. Johnson because he failed to testify that the impairment rating which he assigned to Stormo's injuries was "based upon reasonable medical certainty, from injuries that were a direct result of the accident." Defendants' argument is without merit. Dr. Johnson did testify that Stormo's injuries were sustained in the auto accident, and nowhere do defendants seriously contest this issue. Their argument is based on the failure of Dr. Johnson to recite that his opinion was "based upon reasonable medical certainty." There are no "magic words" needed to express an expert's degree of medical certainty, and the test is only whether the expert's words demonstrate that he or she was expressing an expert medical opinion. *Drexler v. All Amer. Life & Cas. Co.*, 72 Wis.2d 420, 241 N.W.2d 401 (1976). Dr. Johnson's testimony clearly indicates that the impairment rating he assigned to Stormo's injuries was his expert medical opinion. The trial court did not err in admitting his testimony.

### 8. Jury Instruction on Value of Home Health Care.

Defendants objected to the jury instruction on the reasonable value of necessary home health care services provided to Stormo because the jurors were directed to fix an amount based on "what is customarily charged for similar work, according to your common knowledge," and because there was no testimony about household services provided to Stormo. Defendants base their argument on our general rule that a trial court is not required to instruct the jury on issues that do not find support in the record. *See State v. Weisenstein*, 367 N.W.2d 201, 206 (S.D.1985).

Defendants' contention that there was no testimony to support this instruction is contrary to the record. Stormo's father, sister Tracy, and the county nurse all testified about the amount of time they spent with Stormo, the assistance and care they provided, and her inability to care for herself. This testimony was uncontradicted. There was competent testimony to support the giving of this instruction.

 When reviewing the substance of a jury instruction, we examine whether the instructions as a whole provide the jury with a full and correct statement of the applicable law. *Frazier v. Norton*, 334 N.W.2d 865, 870 (S.D.1983). Furthermore, defendants also shoulder the burden to prove not only error in the instruction, but "prejudicial error to the effect that under the evidence, the jury might and probably would have returned a different verdict[.]" *Weisenstein*, 367 N.W.2d at 206. Defendants' challenge to the home health care instruction is based on the fact that "the jury was allowed to just speculate as to what the cost and number of hours per week might be." " 'The rule against indefinite or uncertain damages applies only to such damages as are not the definite or certain results of the wrong. Uncertainty as to the fact is fatal to recovery, but uncertainty as to the measure or extent of the damages does not bar recovery.' " *Schmidt v. Wildcat Cave, Inc.*, 261 N.W.2d 114, 118 (S.D.1977) (citations omitted). *See Tri–State Refining & Inv. Co. v. Apaloosa Co.*, 452 N.W.2d 104, 110 (S.D.1990). We cannot say the trial court erred in instructing the jury to use its common knowledge to determine the amount of damages for home health care. However, it would be a better practice to present some testimony on the reasonable value of the services actually provided. Trial courts would be well advised in cases such as this to submit special interrogatories to the jury regarding the amount awarded for each element of damages. Such a practice would eliminate confusion over what part of the award, if any, was for such services, and aid in meaningful appellate review.

Defendants also take issue with the remarks of Stormo's counsel in her closing argument concerning the value of the services provided to Stormo by family and friends. Her comments were as follows:

The household nursing and personal care—And the Judge will instruct you that you can award some reasonable amount for the services that her family and friends provided her—is a little bit more difficult to calculate, and I've just done an estimate, but you do your own. I'll offer this for your convenience.

Although she presumably got assistance beyond this time, we know there was at least about eight weeks when she got a great deal of nursing home care, home assistance, and that it was seven days a week, and I don't know exactly how long Gina slept each day, but assuming that she slept 10 hours a day, having been injured, 14 hours of waking time she needed some help, and I don't know what you would find a reasonable wage for someone to take care of—a lay person to do nursing, but for my calculation, I used $4.50 an hour. And if you calculate this out, it comes to those services being worth about $3,500. Now, that's—That factor of damages, household services, nursing attendants, is something for you to deal with in your knowledge, and your guess is as good as mine. I just want to give you an indication of how you might figure it.

Defendants assert that these comments coupled with the jury instruction caused a different verdict than would otherwise have been arrived at by the jury. This allegation is conclusory at best as defendants have failed to provide any basis to establish that the verdict probably would have been different. Given the nature of the services provided and the absence of a well-established market to determine the cost of such services, we cannot say it was an abuse of the trial court's discretion to instruct the jury to use their own knowledge to establish a value for the services, and to permit Stormo's attorney to illustrate how such damages might be calculated.

*9. Excessive Damages.*

Defendants contend that the jury award of $360,000 is excessive because it was based on sympathy or prejudice. The trial court refused to disturb the verdict, denying defendants' motion for a new trial or remittitur. In considering this motion, the trial court was required to apply the test of *Schuler v. City of Mobridge,* 44 S.D. 488, 493, 184 N.W. 281, 283 (1921) (citation omitted):

> 'The damages, therefore, must be so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line; for they have no standard by which to ascertain the excess.'

*See Wangen v. Knudson,* 428 N.W.2d 242, 245 (S.D.1988). When reviewing the trial court's decision in this regard, we recognize that the trial court had the benefit of hearing the same evidence as did the jury, and of observing the jury itself for indications that passion or prejudice may have influenced their verdict. *Id.; Brewer v. Mattern,* 85 S.D. 356, 365, 182 N.W.2d 327, 332–33 (1970). Trial courts have broad discretion in granting a new trial based on excessive damages, and the trial court's decision will be reversed only if there was a clear abuse of discretion. *Wangen,* 428 N.W.2d at 245; *Hulstein v. Meilman Food Indus.,* 293 N.W.2d 889 (S.D.1980).

The record of this case supports the jury's verdict and we cannot say that the trial court abused its discretion by refusing to reduce the verdict or grant a new trial. The jury considered eight separate elements of damages in compensating Stormo for her severe injuries. Defendants have not raised any specific facts to indicate that the jury was motivated by sympathy, prejudice or corruption. Based on the facts in this case, we cannot say that $360,000 was an excessive verdict. *Cf. Robichaud v. Theis,* 858 F.2d 392 (8th Cir.1988) (jury verdict of $444,811.29 for plaintiff suffering 8% disability not excessive).

*10. New Trial or Remittitur.*

As their final issue on appeal, defendants contend the trial court abused its discretion in refusing to order a new trial or remittitur. This argument is based on the previously alleged errors as contained in their brief. As noted in the preceding issue, the trial court did not abuse its discretion in denying these motions.

DECISION

Affirmed.

MILLER, C.J., WUEST, HENDERSON and SABERS, JJ., concur.

AMUNDSON, J., not having been a member of the Court at the time this case was considered, did not participate.