613 N.W.2d 64 (2000)
2000 SD 92
Dean MACK and Nancy Mack, Plaintiffs and Appellees,
v.
Dale MACK and Debra Mack, Defendants and Appellants,
A.J. Mack and Mary Mack, Intervenors and Appellants.
Nos. 21235, 21248.
Supreme Court of South Dakota.
Considered on Briefs May 30, 2000.
Decided July 12, 2000.
*65 Thomas J. Linngren of Green, Schulz, Roby, Oviatt, Cummings & Linngren, Watertown, South Dakota, Attorneys for plaintiffs and appellees.
Lee Schoenbeck, Watertown, South Dakota, Attorney for defendants and appellants.
Raymond D. Rylance of Wiles & Rylance, Watertown, South Dakota, Attorneys for intervenors and appellants
SABERS, Justice.
[¶ 1.] Dean Mack commenced proceedings to dissolve his partnership with his brother, Dale Mack. A.J. and Mary Mack, the parents of Dale and Dean, intervened. The trial court granted Dean's petition for dissolution of the partnership and distributed the partnership assets. Dale appeals raising six issues, including one issue raised by intervenors. We affirm.

FACTS
[¶ 2.] A.J. and Mary Mack have nine children, seven girls and two boys, Dale and Dean. They raised their family on a 560-acre dairy farm, which dates back to 1944. In 1985, A.J. was the sole owner of the farm. When his sons graduated from high school, Dale in 1978 and Dean in 1986, A.J. employed them on the farm. During those years of employment, both Dale and Dean purchased equipment to be used in the farming operation. Neither Dale nor Dean was compensated for A.J.'s use of this machinery for the farm.
[¶ 3.] On November 8, 1988, due to A.J.'s failing health, A.J. and Mary executed a farm lease to Dale and Dean, effective from January 1, 1989 to December 31, 1994. The rent was specified at $1,125 per month, or $562.50 payable by each tenant. A.J. and Mary also executed a lease agreement for seventy-two cows and one bull to Dale and Dean for $500 per month, or $250 payable by each tenant. Dale and Dean orally agreed, between themselves, to form a partnership and to continue the farming operation. A.J. allowed them to use his farm machinery, feed and hay in the operation of the partnership. Dale and Dean also contributed the machinery they acquired individually for use by the partnership.
[¶ 4.] Dale and Dean each initially paid monthly rent of $812.50 to A.J. During the course of the lease, A.J. experienced financial difficulties and each partner increased the monthly cash rent to $1,000.
[¶ 5.] When the leases expired on December 31, 1994, the parties continued operating under a similar oral agreement throughout 1995. In 1995, A.J. and Mary executed a contract for deed to sell the farm to Dale and Dean for $255,000, payable over twenty years, with Dale and Dean each paying $1,000 per month beginning January of 1996. The contract for deed specified that Dale and Dean each owned one-half interest in the farm as tenants in common. A.J. and Mary retained a life estate in their home located *66 on a parcel of land referred to as the "Homeplace." There was also testimony that in return for such a financially favorable price, Dale and Dean agreed to provide for their parents' needs for the rest of their lives. However, this "promise" was not reduced to writing.
[¶ 6.] During the term of the partnership, Dean lived two miles from the farm. Dale lived near Castlewood which is several miles from the farm because his wife, Debra, was employed as a school teacher in Castlewood. During this time, the brothers ate three meals a day at A.J. and Mary's home. Dale and Dean provided for their parents by removing snow, paying their utilities, occasionally repairing their home, cleaning the yard, giving them extra money to pay medical bills and supplying them with fresh milk and meat.
[¶ 7.] In late fall of 1996, Dean discussed building a house close to the Homeplace with A.J. and Mary. He testified that he was tired of renting and driving two miles to the farm several times a day to check the cattle, etc. and would like to be closer to the farm. He discussed this with Mary, who initially approved of Dean's proposed building site, but changed her mind the next day.
[¶ 8.] In the spring of 1997, Dean told Dale that he wanted to build a house on the partnership property. Dale thought Dean wanted to build on the "Walford" section, a parcel of land located one mile from the Homeplace.[1] However, it was not until late fall of 1997 that Dean told Dale that he wanted to remove some trees in the Homeplace shelterbelt and build his house a few hundred feet directly north of A.J. and Mary's house. Dale suggested that Dean build his house on the "Walford" section[2] or north of the shelterbelt. Dean insisted on building his home in the shelterbelt. It was at this point that the relationship deteriorated.[3]
[¶ 9.] Dean left the farm on November 30, 1998 and sought dissolution proceedings. A.J. and Mary were allowed to intervene prior to trial.
[¶ 10.] The case was tried on May 20-21, 1999. On September 3, 1999, the trial court terminated the partnership, divided the assets and liabilities, and dismissed with prejudice the claims of Dale against Dean and the claims of A.J. against Dale and Dean. A.J. appeals raising one issue and Dale appeals raising six issues, including the one raised by A.J.

STANDARD OF REVIEW
[¶ 11.] The trial court's findings of fact are reviewed under the clearly erroneous standard. That is, we will not disturb them unless we are "`firmly and definitely convinced a mistake has been made.'" Engels v. Ranger Bar, Inc., 2000 SD 1, ¶ 14, 604 N.W.2d 241, 244-45 (quoting Wood v. SD Cement Plant, 1999 SD 8, ¶ 9, *67 588 N.W.2d 227, 229 (other citations omitted)). Conclusions of law are fully reviewable under a de novo standard. Id.
[¶ 12.] 1. WHETHER DEAN'S TERMINATION OF THE PARTNERSHIP VIOLATED THE PARTNERSHIP AGREEMENT.
[¶ 13.] Dale argues that Dean wrongfully sought dissolution because Dale would not consent to Dean's proposed use of partnership property for his personal use. He also contends that the partnership was functioning for the particular purpose for taking care of their parents and Dean wrongfully dissolved the partnership. Therefore, Dale concludes that Dean is liable to him for damages caused thereby under SDCL 48-5-30(2).
[¶ 14.] The trial court found:
There is no evidence of an agreement by the partners that the partnership would continue, at a minimum, until the death of A.J. and Mary. There is no evidence of an agreement by the partners that it would only go on so long as A.J. and Mary were living. There is no evidence of an agreement by the partners that the partnership would end when the alleged obligation to support A.J. and Mary no longer existed, regardless of whether that would be within days, months, or years after the inception of the partnership. The partnership was formed to farm indefinitely.
The trial court concluded that this was a partnership at will.
[¶ 15.] It is conceded that a partnership existed. The partnership agreement was oral. The duration was not definite nor was a purpose expressed in writing. Therefore, it is presumed that the purpose of the partnership was to "carry on as co-owners a business for profit." SDCL 48-1-2. In other words, it was a partnership at-will:
A partnership formed without a time specified for its continuance, and not formed for a particular transaction or the completion of a particular enterprise, will be considered a partnership to endure so long as the parties continue their mutual consent. This type of partnership is known as a partnership at will.
59A Am.Jur.2d Partnership § 89 (1987). In such a situation, dissolution of the partnership can be sought "by the express will of any partner" at any time and for any reason. Id. (providing that the term of a partnership at will "does not extend... for any longer time than their mutual consent allows.").
[¶ 16.] Dale argues that the purpose of the partnership was to take care of their aging parents. This alleged purpose originates from the execution of the contract for deed; that is, Dale argues that he and Dean received a favorable price for the land in exchange for their promise to provide for their parents. However, the contract for deed is a separate and distinct venture from the partnership agreement. Therefore, while one unstated understanding underlying the execution of the contract for deed may have been to provide for the future needs of the aging couple, that understanding, if there was one, is not conclusive evidence that this was the purpose of the partnership. The trial court was not clearly erroneous in concluding that this partnership was at will. Therefore, Dale is not entitled to recover damages resulting from the dissolution.
[¶ 17.] Dale also argues that Dean breached a fiduciary duty to the partnership by insisting that partnership property be used for his personal benefit. He contends that this breach resulted in a wrongful dissolution of the partnership.
[¶ 18.] Once a partnership is created, the partners owe a fiduciary duty to one another. This duty between partners is "`characterized by a loyalty of the highest order.'" Hayes v. Northern Hills General Hosp., 1999 SD 28, ¶ 54, 590 N.W.2d 243, 253 (quoting Glanzer v. St. Joseph Indian School, 438 N.W.2d 204, *68 211 (S.D.1989)). See also Pear v. Grand Forks Motel Assocs., 553 N.W.2d 774, 783 n6 (N.D.1996) (stating that "[t]he relationship between partners is confidential and fiduciary; they are trustees for each other, and they bear the obligation of the utmost good faith and integrity in their dealings with one another." (citations omitted)). "The existence of a fiduciary duty and the scope of that duty are questions of law for the trial court." Landstrom v. Shaver, 1997 SD 25, ¶ 84, 561 N.W.2d 1, 18 (citation omitted).
[¶ 19.] Here, there is substantial evidence in the record indicating that Dean wanted to build a home on partnership property so he could be readily available to work in the event that something unexpectedly happened. The trial court found that Dean's living on the Homeplace would have benefited the partnership. This is consistent with the presumed purpose of this partnership at will, which was to operate the farm to benefit the partnership.
[¶ 20.] In a partnership at will, each partner has an equal right in the management and operation of the business of the partnership and the ultimate conclusion is based on the majority votes. However, where the partnership consists of two partners who are equally divided and there is no written partnership agreement providing a settlement solution, "the only course of action is to dissolve the partnership." Covalt v. High, 100 N.M. 700, 675 P.2d 999, 1002-03 (N.M.Ct.App.1983) cert denied 100 N.M. 631, 674 P.2d 521 (1984) (citation omitted) (holding that one partner may not recover damages for the failure of the co-partner to acquiesce in a demand that monthly rentals of partnership property be increased and that "there was no breach of a fiduciary duty.").
[¶ 21.] Therefore, "[i]n the absence of a mutual agreement, or a written instrument detailing the rights of the parties, the remedy for such an impasse is a dissolution of the partnership." Id. at 1003. The trial court was not clearly erroneous in refusing to award damages to Dale on the basis of a breach of fiduciary duty.
[¶ 22.] 2. WHETHER THE TRIAL COURT ERRED IN DENYING UNJUST ENRICHMENT DAMAGES TO A.J.
[¶ 23.] A.J. argues that the trial court erred in valuing his inventory claim of feed and grain at zero. He claims that he is entitled to be "compensated for the use of their inventory that enabled Dean and Dale to start up their farming operation in a very favorable position," an amount of $69,750. He asserts that the partnership's use of his inventory was conditioned on Dale and Dean caring for A.J. and Mary for the rest of their lives and that the value of the inventory was to be paid sometime in the future. A.J. also argues that he is entitled to compensation in the amount of $110,400 for the use of his equipment by Dale and Dean from 1989 to the time of trial.
[¶ 24.] In combining these two values with $113,000 in accrued interest, A.J. claims that Dean owes him one-half of $293,450. Dale supports A.J.'s argument and claims that these resources were intended to remain in the partnership and working for the partners while the two cared for their parents, or at least until the year 2015, when the contract for deed was to be paid in full.
[¶ 25.] The trial court first determined that "[t]here is no evidence of a contract, oral or written," providing that the partnership will compensate A.J. for the use of his inventory or machinery. The trial court then determined that A.J.'s unjust enrichment claim failed because the "land sale contract is complete unto itself." It further stated:
In this case there is conflicting testimony about whether the price of the land, a good price, below market value, was given in exchange for the partners' promise to take care of A.J. and Mary for the rest of their lives. Given the evidence, and the credibility of the witnesses, *69 it is more likely than not that the good deal was not induced by, or a quid pro quo for, a promise of lifetime care.
Whatever the family discussions were about the price of land, the parties unequivocally stated in paragraph IV of the Contract for Deed that "As total consideration for the property ..." a certain sum was to be paid. No mention was made of the partners making a commitment to long term care of their parents....
[¶ 26.] In Issue 1, we determined that the purpose of this partnership agreement was not to take care of A.J. and Mary for their lifetime, but to operate the farm to benefit the partnership. Therefore, A.J.'s argument that he is entitled to compensation based upon Dean's alleged breach of this "promise" fails.
[¶ 27.] Unjust enrichment is an equitable doctrine. It occurs "when one confers a benefit upon another who accepts or acquiesces in that benefit, making it inequitable to retain that benefit without paying." Parker v. Western Dakota Insurors, Inc., 2000 SD 14, ¶ 17, 605 N.W.2d 181, 187 (citing Juttelstad v. Juttelstad, 1998 SD 121, ¶ 19, 587 N.W.2d 447, 451 (other citations omitted)). When unjust enrichment is found, the law implies a contract, which requires the defendant to compensate the plaintiff for the value of the benefit conferred. In order to establish unjust enrichment, three elements must be proven: (1) a benefit was received; (2) the recipient was cognizant of that benefit; and (3) the retention of the benefit without reimbursement would unjustly enrich the recipient.
[¶ 28.] Here, A.J. cannot support his claim for unjust enrichment. Undoubtedly, the partnership received a benefit by not having to pay A.J. for the value of his inventory and the use of his machinery. Dean does not dispute that the partnership received a benefit; however, he claims that it was a gift.[4]
[¶ 29.] In order to prove that Dean was unjustly enriched by the use of A.J.'s feed and machinery, there must be some convincing evidence establishing that this was not gratuitous. After hearing all the evidence, the trial court concluded that A.J. could not prove the funds were a loan because no agreement, expressed or implied, could be shown. It further concluded that the contract for deed provided that "As total consideration for the property..." a sum certain was to be paid. If A.J. intended to be compensated for the value of his inventory as well as for the use of his machinery, he should have expressed it within the contract for deed.
[¶ 30.] Based on the evidence, the trial court concluded that the partnership's use of A.J.'s inventory and machinery was a gift despite A.J.'s testimony that he did not intend to make a gift. This case is devoid of any evidence showing Dale and Dean were under an obligation to repay the money or that defendants either expressly or impliedly ever promised to repay it. "[T]he mere fact that one party benefits from the act of another is not of itself sufficient to justify restitution." Meehan v. Cheltenham Township, 410 Pa. 446, 189 A.2d 593, 596 (1963). The circumstances of this case do not require the law to imply a contract in order to avoid an injustice. Furthermore, unless there is injustice in a son's acceptance of his father's gifta proposition few would supportthere was no unjust enrichment here. We affirm.
[¶ 31.] 3. WHETHER DEAN SHOULD BE PROMISSORILY ESTOPPED FROM DENYING THE EXISTENCE OF A PARTNERSHIP AGREEMENT FOR A PARTICULAR PURPOSE.
[¶ 32.] Dale argues Dean should be promissorily estopped from denying that the partnership existed for the purpose of *70 caring for A.J. and Mary. He claims that "Dean's promise to A.J. and Dale allowed Dean to enter the partnership right out of high school with no capital as a farm laborer, and yet ten years later [take] substantial equity away from the partnership."
[¶ 33.] In Issue 1, supra, we held that the trial court correctly determined that this was a partnership at will and that the purpose of the partnership was not the lifetime care of A.J. and Mary. Thus, under these circumstances, we need not discuss this Issue further.
[¶ 34.] 4. WHETHER THE TRIAL COURT ERRED IN VALUING FIVE GRAIN BINS AND A HAY SHED AS PERSONAL PROPERTY.
[¶ 35.] Five grain bins and a hay shed were purchased and constructed on the Homeplace by Dale and Dean after A.J.'s retirement. Dale claims that the values of the grain bins and hay shed were included in the value of the real property. Therefore, he argues that the trial court erred in valuing them separately as personal property, thereby increasing the total valuation of the Homeplace by ten percent.
[¶ 36.] The valuation testimony was presented to the trial court by stipulation in Exhibits 25 and 26. Exhibit 25 reflects that both parties valued the Homeplace at $270,000 with a debt of $232,850. However, Exhibit 26, entitled "Partnership Personal Property and Values," reflects that the parties stipulated to the following:

 IN PLACE SOLD AT
 VALUE AUCTION VALUE
EZ Dry Bin 15,000 8,000
Hayshed 3,750 200
2 Air Bins (Per Compromise) 11,000 5,000
2 Steel Bins (Walfords) 1,000 1,000
 ______ ______
TOTAL VALUES 30,750 14,200
PLUS COMPRISED
FIGURE ABOVE 222,275 222,275
 _______ _______
TOTAL VALUE
OF PROPERTY 253,025 236,475

[¶ 37.] Clearly, the parties treated the grain bins and hay shed as personal property and not as fixtures. A value, separate from the value of the Homeplace, was assigned to the grain bins and hay shed by the parties. If Dale had intended that the grain bins and hay sheds be valued as a fixture to the Homeplace, he should have submitted a proposed value of zero on Exhibit 26. Based on the evidence presented, the trial court was not clearly erroneous in treating the grain bins and hay shed as personal property and assigning values to them separate from the value of the Homeplace.
[¶ 38.] 5. WHETHER THE TRIAL COURT ERRED IN DENYING INDIVIDUAL PARTNERSHIP ACCOUNTS.
[¶ 39.] Doug Uthe, a certified public accountant, submitted a written report and concluded that, prior to considering A.J.'s claims, the partnership accounts had a balance of $187,334 for Dean and $226,626 for Dale. Dale claims that the trial court did not calculate the partnership accounts in its findings of fact and conclusions of law and erred in failing to reimburse him the difference or $39,292 under SDCL 48-5-35, -37.
[¶ 40.] Dean points out that Dale and Dean did not follow the "normal" partnership accounting procedures. Instead of filing a partnership tax return and reporting their share of the income on their own individual tax returns, they divided all income and expenses evenly at the time of receipt or expenditure and then simply filed identical Schedule F's, attached to their respective IRS 1040 forms. Hence, no running "capital accounts" were maintained, as presumed or proposed by Lithe. He asserts that Dale is attempting "to receive additional credit for the difference in the amount of [Dale's] equipment" as compared to Dean's. He claims this credit was already provided to Dale.
[¶ 41.] The record reflects that Dale and Dean each received their own equipment at the time of dissolution and such equipment was not part of the litigation.[5] *71 [¶ 42.] Based on the evidence, it is not been shown that the trial court was clearly erroneous in denying individual partnership accounts.
[¶ 43.] 6. WHETHER THE TRIAL COURT'S DISTRIBUTION OF PARTNERSHIP ASSETS WAS ERROR.
[¶ 44.] In dissolving the partnership, the trial court partitioned the farm unit and distributed land to Dean. Dale requests that if we determine that Dean's dissolution of the partnership was wrongful, the case be remanded. He claims that under SDCL 48-5-31, he has the right to continue the farm business and pay Dean the net amount owing.
[¶ 45.] Dean claims that that statute does not apply here unless the trial court erred in deciding that: (1) the partnership was at-will, and that (2) Dale wrongfully withheld his consent from Dean to construct a residence on partnership property. It has not been shown that the trial court erred on either.
[¶ 46.] Because we affirm Issue 1 that this was a partnership at will instead of a partnership for a definite term or for a specific undertaking, we find no error or reason to reconsider the allocation of partnership assets.
[¶ 47.] Affirmed.
[¶ 48.] AMUNDSON, KONENKAMP, and GILBERTSON, Justices, concur.
[¶ 49.] MILLER, Chief Justice, concurs in part and concurs in result in part.
MILLER, Chief Justice (concurring in part and concurring in result in part).
[¶ 50.] Although I fully concur on Issues 1, 4 and 5, I can only concur in result on Issues 2, 3 and 6 because it was unnecessary to write on them for the reasons stated in the majority opinion at paragraphs 26, 33 and 46.
NOTES
[1] The partners kept calves in existing barns on the Walford section and checked on them two to three times per day.
[2] In 1985, Dale married Debra and asked A.J. and Mary if they could build a house on the Homeplace. A.J. and Mary refused to allow them to build on the Homeplace, but told them they could build on the Walford section.

Mary testified that a second home was never allowed on the Homeplace section and that all of her children were aware of that. Mary further testified that she did not get along with Dean's wife, Nancy. Dean testified that he knew that his parents did not get along with Nancy, but living next to them would not cause additional conflict.
[3] The partners purchased a round baler on April 14, 1997 and a square baler in June of 1997. However, no farm equipment was purchased by the partnership after Dean disclosed that he wanted to build in the shelterbelt.

In January of 1998, Dean presented Dale with a letter drafted by Dean's attorney dated January 6, 1998. It provided in part:
I would recommend that you give this letter to your brother Dale and see if you cannot work out your difficulties. If not, you should get back to me within the next ten days so we could proceed to attempt to get the dissolution started.
Dean insisted on building his house in the shelterbelt and Dale refused his consent.
[4] Exhibit 29, entitled "If A.J. had Sold All Equipment and FeedBalance After TaxesJanuary 1, 1989," shows that Dean valued the partnership's use of A.J.'s equipment and feed at $157,617.51.
[5] The "capital accounts," proposed by Uthe, consist of the equipment brought into the partnership by the individual partners. Uthe deducted the value of the use of Dean's equipment from Dean's capital account and added that value to Dale's capital account. Uthe also subtracted the payments Dale made on his combine and baler loans and added that figure to Dale's capital account. Finally, Uthe deducted the value of Dale's baler, which was traded-in, from Dean's capital account and added that value to Dale's capital account.